## S00P0289. GISSENDANER v. THE STATE.

(532 SE2d 677)

THOMPSON, Justice.

Kelly Renee Gissendaner was convicted of the malice murder of her husband, Douglas Morgan Gissendaner.[1] The jury fixed Gissendaner's sentence at death, finding as statutory aggravating circumstances that the murder was committed during the commission of kidnapping with bodily injury, a capital felony, and that Gissendaner caused or directed another to commit the murder. OCGA § 17-10-30 (b) (2) and (6). For the reasons set forth below, we affirm both the conviction and the death sentence.

1. Gissendaner and the victim had been married, divorced, remarried, separated, and reunited between 1989 and 1997. Ms. Gissendaner was in a relationship with Gregory Bruce Owen and at one point stated to a co-worker that she was unhappy with her husband and in love with Owen.

Prior to Gissendaner's trial, Owen entered an agreement not to seek parole within 25 years, pled guilty, and received a sentence of life in prison. Owen testified at Gissendaner's trial that it was she who first raised the idea of murder and that she later raised the idea again several other times. Owen suggested divorce as an alternative, but Gissendaner insisted upon murder because she believed she would receive insurance money from her husband's death and because she believed he "wouldn't leave [her] alone by just divorcing him." Gissendaner had previously stated to Owen's sister that she intended to use the victim's credit to get a house and then "get rid of him."

During the days leading up to the murder, Gissendaner made 47

---

[1] The murder occurred on February 7, 1997. Gissendaner was indicted on April 30, 1997, by the Gwinnett County Grand Jury for malice murder and felony murder. The State filed written notice of its intent to seek the death penalty on May 6, 1997. Gissendaner's trial began on November 2, 1998, and the jury found her guilty of malice murder and felony murder on November 18, 1998. The felony murder conviction was vacated by operation of law. *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993); OCGA § 16-1-7. On November 19, 1998, the jury fixed Gissendaner's sentence at death. Gissendaner filed a motion for a new trial on December 16, 1998, which she amended on August 18, 1999, and which was denied on August 27, 1999. Gissendaner filed a notice of appeal on September 24, 1999. This appeal was docketed on November 9, 1999, and orally argued on February 29, 2000.

telephone calls to Owen and paged him 18 times. Telephone records also showed that the pair were together at a bank of payphones several hours before the murder.

On the evening of February 7, 1997, Gissendaner drove Owen to her family's home, gave him a nightstick and a large knife, and left him inside the home to wait for the victim. Gissendaner then drove to a friend's house, and, upon Gissendaner's insistence that the group keep their plans for the evening, she and her friends went out to a nightclub.

The victim arrived home shortly after 10:00 p.m. Owen confronted the victim from behind, held a knife to his throat, forced him to drive to a remote location, forced him to walk into the woods and kneel, and then killed him by striking him with the nightstick and then stabbing him repeatedly in the back and neck with the knife. As instructed by Gissendaner, Owen took the victim's watch and wedding ring before killing him to make the murder appear like a robbery.

Gissendaner returned home from the nightclub at about the time the murder was being carried out, paged Owen with a numeric signal, and then drove to the crime scene. After inquiring if her husband was dead, she took a flashlight and went toward the body to inspect it. Owen burned the victim's automobile with kerosene provided by Gissendaner, and the pair returned to their respective homes in Gissendaner's automobile. Owen disposed of the nightstick, the knife, a pair of his own jeans, and the victim's stolen jewelry by placing them in the garbage. A pair of Owen's sweat pants also worn on the night of the murder was recovered, however, and DNA analysis of blood found on them showed a likely match with the victim's and Owen's blood.

After the murder, Gissendaner concealed her relationship with Owen from police and claimed not to have initiated contact with him for some time. Telephone records, Owen's testimony, and other witness testimony proved otherwise. After her arrest, Gissendaner called her best friend and confessed to her active and willing role in the murder, although she then called a second time and claimed that she was coerced into participating. Gissendaner wrote a letter while in jail in an effort to hire someone to give perjured testimony and to rob and beat witnesses.

Viewed in the light most favorable to the verdict, we find that the evidence introduced at trial was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that Gissendaner was guilty of the crimes of which she was convicted and that statutory aggravating circumstances existed. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); OCGA § 17-10-30 (b) (2) and (6).

## *Pretrial Proceedings*

2. Gissendaner contends that the trial court erred in denying her motion for a change of venue. The trial court reserved its ruling until after voir dire had been completed and then denied the motion. We find that the trial court acted properly within its discretion in denying the motion. *Tolver v. State*, 269 Ga. 530, 532-533 (4) (500 SE2d 563) (1998) (recognizing trial court's discretion in considering a motion for a change of venue).

A capital defendant seeking a change of venue must show that the trial setting was inherently prejudicial as a result of pretrial publicity or show actual bias on the part of the individual jurors. *Jenkins v. State*, 269 Ga. 282, 286 (3) (498 SE2d 502) (1998); *Jones v. State*, 267 Ga. 592, 594 (1) (a) (481 SE2d 821) (1997); *Jones v. State*, 261 Ga. 665, 666 (2) (409 SE2d 642) (1991) (holding a change of venue is required when a "defendant can make a substantive showing of the likelihood of prejudice by reason of extensive publicity").

The trial court acted properly in reserving its ruling on Gissendaner's motion for a change of venue until voir dire had been conducted because "[t]he decisive factor in determining whether a change of venue is required is 'the effect of the publicity on the ability of prospective jurors to be objective.'" *Wilson v. State*, 271 Ga. 811, 822 (19) (525 SE2d 339) (1999) (quoting *Freeman v. State*, 268 Ga. 185, 186-187 (2) (486 SE2d 348) (1997)). During voir dire, it became apparent that a large portion of the pretrial publicity had occurred long before the case was ready for trial. See *Freeman v. State*, 268 Ga. at 186-187 (2); see also *Thornton v. State*, 264 Ga. 563, 574 (17) (449 SE2d 98) (1994). Furthermore, this early publicity did not implicate Gissendaner in her husband's death. As law enforcement authorities developed their evidence, the publicity became unfavorable to Gissendaner, but we note that the coverage was mostly accurate and largely involved aspects of the case that were not to be disputed at trial. See *Barnes v. State*, 269 Ga. 345, 347 (2) (496 SE2d 674) (1998). Nevertheless, we must acknowledge, as did the trial court, that some of the later publicity was potentially damaging to Gissendaner and that its effect upon the jury pool warrants careful consideration. We most carefully consider the publicity surrounding this Court's ruling on interim review that an inculpatory statement by Gissendaner should be suppressed. *Gissendaner v. State*, 269 Ga. 495 (500 SE2d 577) (1998); see *Tolver*, 269 Ga. at 533 (4); see also *Tyree v. State*, 262 Ga. 395, 395-397 (1) (418 SE2d 16) (1992). Upon our review of the newspaper and television coverage documented in the record, we conclude that it was neither so extensive and inflammatory nor so reflective of "an atmosphere of hostility" as to require a change of venue. *Cromartie v. State*, 270 Ga. 780, 782 (2) (514 SE2d 205) (1999).

The trial court excused the following 13 jurors upon Gissendaner's motion based primarily upon their exposure to pretrial publicity: Waldrip; Myers; Krug; Jones; Chapman; Chappell; Henderson; Bullock; Teehan; Moreno; Hill; Hoffman; and Jackson. The trial court excused juror Foster based upon two defense arguments, one being the juror's exposure to pretrial publicity. Gissendaner argues that her challenges for cause concerning jurors Johnston and Mason were improperly denied, but we find that the trial court did not err in qualifying these jurors because their exposure to pretrial publicity was limited and their memories of what they had been exposed to were vague. Thus, 14 jurors of the 111 jurors questioned during voir dire were excused for cause based upon their exposure to pretrial publicity. We conclude that the number of excusals, particularly in light of the exacting standard applied by the trial court in reaching its decision to excuse certain jurors, is not indicative of the kind of inherently prejudicial environment requiring a change of venue. See *Tharpe v. State*, 262 Ga. 110, 111 (5) (416 SE2d 78) (1992); compare *Jones v. State*, 261 Ga. at 665-666 (1).

3. We find that the trial court did not err in refusing to strike for cause the jurors discussed in Gissendaner's appeal.

(a) Shortly before voir dire began, juror Mason had seen a newspaper article reporting on Gissendaner's upcoming trial, including the fact that a statement made by Gissendaner had been suppressed. However, Ms. Mason stated that she had "just skipped through" the article and could not remember details from it. She did vaguely recall something about "whether rights were read," but she had no recollection of the substance of Gissendaner's suppressed statement or anything else prejudicial to Gissendaner. Furthermore, she stated clearly that she would set aside any prior knowledge of the case and consider only the evidence presented at trial.

A prospective juror need not be "totally ignorant of the facts and issues involved" in a criminal proceeding in order to be qualified to serve. *Irvin v. Dowd*, 366 U. S. 717, 722 (81 SC 1639, 6 LE2d 751) (1961). Because Ms. Mason had very limited knowledge about Gissendaner's case, because it appears she was not prejudiced against Gissendaner, and particularly because she could not specifically recall any information that was to be excluded from evidence at trial, we conclude that the trial court properly qualified her to serve. See *DeYoung v. State*, 268 Ga. 780, 784 (4) (b) (493 SE2d 157) (1997).

(b) Gissendaner contends that the trial court erred in denying her motion to excuse juror Vandenakker for cause based upon his views on the death penalty. Mr. Vandenakker's responses initially evinced a preference for the death penalty in cases of "premeditated murder." However, his responses seeming to favor the death penalty were elicited by defense counsel's attempt to direct the juror's atten-

tion to a particular species of malice murder, namely malice murder where significant premeditation has occurred. In fact, defense counsel was properly admonished for doing so. See *Carr v. State*, 267 Ga. 547, 554 (6) (a) (480 SE2d 583) (1997) ("[I]t is improper to require the juror to enumerate hypothetical circumstances in which she might or might not vote to impose the death penalty."). Furthermore, Mr. Vandenakker indicated a willingness to consider all three sentencing options in light of mitigation evidence: "I would have to wait to hear [evidence in the sentencing phase] before I determined if it was a death penalty or life in prison or life in prison without parole." Because the juror was willing to consider any mitigating evidence and to consider all authorized sentencing options, we find that the trial court did not abuse its discretion in determining that his views on capital punishment would not " 'prevent or substantially impair . . . his duties as a juror in accordance with his instructions and his oath.' " *Greene v. State*, 268 Ga. 47, 48-50 (485 SE2d 741) (1997) (quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985)).

(c) Gissendaner contends that the trial court improperly denied her motion to disqualify juror Schie. Contrary to Gissendaner's argument on appeal, a juror who expresses a leaning toward the death penalty is not necessarily unsuited for service. *Mize v. State*, 269 Ga. 646, 652 (6) (d) (501 SE2d 219) (1998). Although juror Schie expressed an inclination toward the death penalty in murder cases, she qualified her expressed inclination by stating, "But I know there's different cases." She also stated repeatedly that she would consider all three sentencing options and that she was capable of voting in favor of a sentence less than death. The trial court did not abuse its discretion in qualifying this juror. *Greene v. State*, 268 Ga. at 48-50.

Likewise, our review of the record indicates that neither juror Still's nor juror Love's views on capital punishment disqualified them for service. Although they both admitted some leaning toward the death penalty, they both also stated clearly and repeatedly that they would consider all three sentencing options and that they were capable of voting in favor of a sentence less than death.

(d) Juror Winn acknowledged that he might, as surely all jurors might, be led to lean toward a determination of guilt or innocence based upon some of the evidence presented at trial but before all of the evidence had been presented. He stated: "I might come to some initial thought. I could see that happening, something might be said that would trigger a strong feeling one way or the other before the whole thing is over. That's entirely possible." Not only do we not find this acknowledgment troubling standing alone, we further note that the juror specifically stated that he would reserve final judgment

until called upon for his verdict, although, in an admirable display of forthrightness, still acknowledging that "it could coincidentally be the same decision I thought of earlier." The trial court did not abuse its discretion in denying Gissendaner's motion to excuse this juror for cause.

(e) The record does not support Gissendaner's assertion that juror Beavers was predisposed toward the death penalty. Furthermore, Ms. Beavers stated clearly that she would consider all evidence and all three sentencing options and that she was capable of imposing a sentence less than death. We also find that Ms. Beavers's limited knowledge of the case drawn from her vague recollection of news reports did not require her disqualification. *Irvin v. Dowd*, 366 U. S. at 722.

(f) The trial court did not err in disqualifying juror Strong based upon her statement to the trial court, after some equivocation under questioning by counsel, that she did not know if she could impose the death penalty and based upon her becoming emotionally distraught during questioning on the topic. The trial court did not abuse its discretion in excusing this juror. *Greene v. State*, 268 Ga. at 48-50; *Wainwright v. Witt*, 469 U. S. at 424.

4. Upon reviewing the record, we conclude that the trial court did not improperly restrict Gissendaner's questioning on voir dire in general or with regard to the following jurors specifically discussed on appeal: Still; Beavers; Hampton; Strong; Mathis; Chappell; Smith; Derda; and Rumble. The trial court permitted a thorough examination of each of the jurors and properly sustained meritorious objections. "The scope of voir dire is largely left to the trial court's discretion, and the voir dire in this case was broad enough to ascertain the fairness and impartiality of the prospective jurors." *Barnes v. State*, 269 Ga. at 351-352 (10). The trial court was correct in preventing defense counsel from questioning jurors as to their willingness to impose the death penalty under specified hypothetical circumstances. *Carr v. State*, 267 Ga. at 554 (6) (a). The trial court did not err in restricting counsel's questions concerning the perceived credibility of law enforcement officers as compared with ordinary citizens. *Henderson v. State*, 251 Ga. 398, 400 (1) (306 SE2d 645) (1983). Nor did the trial court err in limiting repetitive, misleading, and irrelevant questions. Id. at 401.

5. Gissendaner contends that the jury pools from which her grand jury and traverse jury were selected were created in a racially-discriminatory manner. We disagree.

Gissendaner's expert witness testified before the trial court that African-Americans comprised 5.1 percent of the population of the county according to the 1990 census but only 3.8 percent of registered voters. The expert concluded that Caucasians were selected from the

voter registration list for inclusion in the jury pool in less than proportional numbers by the process of forced balancing. The expert witness attempted to bolster her argument that Caucasians were excluded in selecting the jury pools by suggesting that the percentage of African-Americans in the population of the county had even decreased to 4.6 percent since the 1990 census.

Members of the county's jury commission testified that the percentage of African-Americans in the jury pool was precisely the same as the percentage of African-Americans in the population in the county as determined by the 1990 census, and Gissendaner's expert testimony seemed to confirm their testimony. The method of forced balancing employed by the county in ensuring this proportionality was not unlawful. *Sears v. State*, 262 Ga. 805, 806 (2) (426 SE2d 553) (1993). Gissendaner also failed to demonstrate the exclusion of any arguably-cognizable group subsumed under the category of "other" in the county's voter registration records, the source from which the jury pools were drawn. We find that the trial court did not err in concluding that Gissendaner had failed to make a prima facie case of discrimination in the selection of the jury pools from which her grand and traverse juries were drawn. See *Bowen v. State*, 244 Ga. 495, 500 (I) (4) (260 SE2d 855) (1979).

Gissendaner, by recalculating figures appearing in an exhibit provided by her expert witness, now asserts on appeal that African-Americans actually comprised 7.4 percent of the registered voters in the county and, therefore, that it was African-Americans rather than Caucasian persons who were selected in less than proportional numbers. Without addressing the waiver issue involved in Gissendaner's reversal of argument, we conclude that, even assuming the validity of the figures set forth on appeal, the jury pools did not unlawfully exclude African-Americans. See Unified Appeal Procedure, Rule II (A) (6).[2]

## Trial Proceedings

6. The trial court did not err in excluding testimony by one of the victim's co-workers about a statement made by the victim.

Hearsay must be necessary and must be accompanied by particular guarantees of trustworthiness in order to be admissible under the necessity exception. OCGA § 24-3-1 (b); *Chapel v. State*, 270 Ga. 151, 154-156 (4) (510 SE2d 802) (1998). A trial court should view the proffered hearsay within the totality of the circumstances of its ori-

---

[2] Cases where notice that the State intends to seek the death penalty is given after January 27, 2000, shall be governed by the revised version of the Unified Appeal Procedure. The corresponding rule in the revised outline is Rule II (C) (6).

gin, and, because the "[f]actors that speak to the reliability of [hearsay] statements will vary depending on the nature of the statements," the determination of trustworthiness is inescapably subjective. Id. at 155. Accordingly, that determination is evaluated on appeal under an abuse of discretion standard. *White v. White*, 262 Ga. 168, 169 (415 SE2d 467) (1992).

The trial court admitted one hearsay statement by the deceased victim where the statement had been made immediately after concluding a telephone call and where the victim appeared "really scared and jolted." In contrast, the excluded hearsay statement was made after the victim, returning from his lunch break, "just nonchalantly walked in and was talking to [the witness]." The witness further stated during the defense's proffer that the declarant "didn't look afraid or nothing." Application of the necessity exception requires

> "a circumstantial guaranty of the trustworthiness of the offered evidence – that is, there must be something present [in the making of the statement] which the law considers a substitute for the oath of the declarant and his [or her] cross examination by the party against whom the hearsay is offered."

(Citations and emphasis omitted.) *Chrysler Motors Corp. v. Davis*, 226 Ga. 221, 224 (1) (173 SE2d 691) (1970); see also *Abraha v. State*, 271 Ga. 309, 313 (2) (518 SE2d 894) (1999). The trial court did not abuse its discretion in excluding this casually-rendered statement concerning matters over which cross-examination would be potentially important while admitting another similar statement made under circumstances more suggestive of trustworthiness.

7. The trial court did not err, as Gissendaner contends, in admitting photographs and a videotape depicting the victim's body as it was found at the crime scene and prior to autopsy. *Jackson v. State*, 270 Ga. 494, 498 (8) (512 SE2d 241) (1999); *Jenkins v. State*, 269 Ga. at 293 (20). "Photographs showing the condition and location of the victim's body are admissible where alterations to the body are due to the combined forces of the murderer and the elements." *Klinect v. State*, 269 Ga. 570, 574 (4) (501 SE2d 810) (1998).

The photograph of the victim in life was also properly admitted. *Ledford v. State*, 264 Ga. 60, 66 (14) (439 SE2d 917) (1994).

8. The trial court, after hearing testimony from law enforcement officers that road conditions leading to the scene were unsafe, did not abuse its discretion in denying Gissendaner's motion to have the jury view the crime scene. *Sutton v. State*, 237 Ga. 418, 419 (3) (228 SE2d 815) (1976). Gissendaner was allowed to introduce numerous photographs of the crime scene that she was able to use in support of her

theory of defense. See *Williams v. State*, 202 Ga. App. 728, 729 (3) (415 SE2d 327) (1992).

9. Gissendaner argues that the trial court improperly limited her closing argument. Prior to an objection by the State, Gissendaner's counsel argued the following:

> [T]hrough the evidence, we have learned a lot about Doug Gissendaner. We know he was a healthy, strong individual. We know he outweighed Mr. Owen. We know he was tall. We know he worked as a mechanic, and we know that Doug Gissendaner had recently served in the United States Army. We know that in the United States Army he went through basic combat training. We know that he trained in combat arms. He was combat arms qualified. We know he was a tanker in the Army corps. We know he served in a combat theater in Desert Storm. And, therefore, we know that he had escape and evasion training.

The State then raised an objection, which the trial court sustained stating, "Counsel can only comment on what's in evidence." Defense counsel's argument was again interrupted by an objection after counsel stated the following: "I would suggest to you as a reasonable inference from his service in the army and from his having served in a combat theater he was trained in how to defend himself in the woods." The trial court sustained the objection and stated, as part of an instruction that is difficult to interpret definitively in print: "That's testimony. It's not permissible."

Counsel certainly are permitted to argue reasonable inferences from the evidence presented at trial. *Simmons v. State*, 266 Ga. 223, 228 (6) (b) (466 SE2d 205) (1996). We need not address whether the specific inferences objected to in this case were reasonable, however, because we conclude that, regardless of whether the trial court's rulings were correct, Gissendaner was not harmed by them. *Johnson v. State*, 238 Ga. 59, 60-61 (230 SE2d 869) (1976); *Dill v. State*, 222 Ga. 793, 794 (1) (152 SE2d 741) (1966). Defense counsel had already set out the pertinent aspects of the evidence, the jury was not instructed to disregard anything counsel had said, the trial court clearly stated that "[t]he jury may draw reasonable inference[s]," and defense counsel was later allowed to argue vigorously the theory that the victim could not have been murdered by Owen alone. Under these circumstances, we conclude that Gissendaner has not suffered any harm, even assuming any error by the trial court.

10. We disagree with Gissendaner's contention that the State made improper arguments at the close of the guilt/innocence phase of her trial that require reversal of her conviction and death sentence.

(a) Early in his argument, the Senior Assistant District Attorney stated, "[W]hat you just heard from [defense counsel] has done a tremendous violence to the truth in this case." The prosecutor continued by further suggesting defense counsel's argument had failed to comport with the evidence and by referring to counsel's argument as "an insult to the truth." Defense counsel objected to the argument on the sole basis that it was a "personal attack."

We are concerned that counsel should adhere to the highest standards of professionalism and proper courtroom decorum, see *Davis v. State*, 255 Ga. 598, 610 (16) (340 SE2d 869) (1986); see also *Miller v. State*, 228 Ga. App. 754, 757 (6) (492 SE2d 734) (1997), and, accordingly, we find distasteful any argument that unnecessarily impugns the integrity of opposing counsel, even if obliquely. However, in this case, we do not conclude that the trial court erred in failing to make a clear ruling in Gissendaner's favor upon her one objection. *Simmons v. State*, 266 Ga. at 228-229 (6) (b) ("[T]his Court has long held that the permissible range of argument during final summation is 'very wide.' [Cits.]" ).

(b) Gissendaner contends that other statements by the prosecutor constituted improper personal attacks upon defense counsel, but because no objections were raised to these allegedly-improper statements, Gissendaner's contention is waived insofar as it concerns the jury's determination of her guilt. *Miller v. State*, 267 Ga. 92 (2) (475 SE2d 610) (1996); see *Whatley v. State*, 270 Ga. 296, 304-305 (509 SE2d 45) (1998) (Thompson, J., concurring specially). However, when the death penalty has been imposed, we must also consider whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). In doing so, we consider whether any allegedly-improper arguments that were not objected to at trial in reasonable probability " 'changed the jury's exercise of discretion in choosing between life imprisonment or death.' " *Hicks v. State*, 256 Ga. 715, 730 (23) (352 SE2d 762) (1987) (quoting *Ford v. State*, 255 Ga. 81, 94 (8) (I) (2) (335 SE2d 567) (1985); compare *Mullins v. State*, 270 Ga. 450, 450-451 (2) (511 SE2d 165) (1999) ("This 'reasonable probability' test applies only in the context of appellate review of a criminal case in which the death penalty was imposed."). We conclude, even assuming the arguments contested by Gissendaner were improper, that the jury's exercise of discretion would not have been affected by them and, therefore, that her sentence should not be disturbed.

(c) Gissendaner contends that her conviction should be reversed because the Senior Assistant District Attorney referred to her as "evil" in his closing argument. Because Gissendaner made no objection at trial, this issue is waived insofar as it concerns the jury's determination of her guilt. *Miller v. State*, 267 Ga. at 92 (2); see

*Whatley v. State*, 270 Ga. at 304-305 (Thompson, J., concurring specially). Even assuming the comment was improper, we conclude that there is no reasonable probability that the comment changed the jury's exercise of discretion in fixing her sentence at death, and, accordingly, we conclude that her sentence should not be disturbed. See *Whatley v. State*, 270 Ga. at 304-305 (Thompson, J., concurring specially); see also *Simmons v. State*, 266 Ga. at 228 (6) (b) (characterizing defendant as "mean" and a "wife-beater" not improper when supported by the evidence).

(d) There is no merit to Gissendaner's argument that the State improperly sought to bolster the credibility of its witnesses by commenting that the defendant's presentation of witnesses resembled "somebody drowning, grasping at straws."

11. OCGA § 17-10-1.2 is not unconstitutional as written, and the trial court properly reviewed the State's victim impact testimony prior to trial and did not admit unduly inflammatory or prejudicial evidence. *Livingston v. State*, 264 Ga. 402, 402-405 (1) (444 SE2d 748) (1994); *Jones v. State*, 267 Ga. at 595-596 (2).

*Sentencing Phase*

12. During the sentencing phase of her trial, Gissendaner sought to admit into evidence several letters from her children in order to show the children's love for her. The trial court excluded the letters as hearsay but allowed the children's grandmother to testify that the children had written letters to their mother in jail.

We have held that trial courts should exercise broad discretion in admitting any mitigating evidence during the sentencing phases of death penalty trials. *Barnes v. State* 269 Ga. at 357-361 (27). But *Barnes* does not require the wholesale admission of all evidence contended to be mitigating without respect to its reliability and the rules of evidence. See *Smith v. State*, 270 Ga. 240, 249 (12) (510 SE2d 1) (1998) ("[T]he hearsay rule is not suspended in the sentencing phase."). Evidence that is inadmissible under this State's rules of evidence need only be admitted when the potentially-mitigating influence of the evidence outweighs the harm resulting from the violation of the evidence rule. *Collier v. State*, 244 Ga. 553, 566-568 (11) (261 SE2d 364) (1979) (applying *Green v. Georgia*, 442 U. S. 95 (99 SC 2150, 60 LE2d 738) (1979)). Because the evidence rules exist for the purpose of winnowing out unreliable evidence, a trial court, in determining the admissibility of proffered evidence, must consider whether "substantial reasons exist[ ] to assume its reliability." *Collier v. State*, 244 Ga. at 567.

The trial court in Gissendaner's case expressed a reasonable concern about the reliability of hearsay statements written by young

children under unknown circumstances and influences. Additionally, the availability of the hearsay declarants to serve as witnesses at trial and the availability of their grandmother to testify that they had written to their mother both undermined Gissendaner's assertion that admission of the hearsay statements was critical to her defense. OCGA § 24-3-16, which governs the admissibility of the hearsay statements of children subjected to abuse, was not controlling in this murder case, and, furthermore, we find that the concerns to be addressed in assessing the reliability of children's hearsay testimony under that statute and its related case law were largely the same as those addressed by the trial court. Pretermitting the questions of whether the children's drawings contained in the letters were admissible or whether Gissendaner ever attempted to admit the drawings by themselves, we conclude that the drawings by themselves would have had no effect on the jury's deliberations. See *Todd v. State*, 261 Ga. 766, 767-768 (2) (a) (410 SE2d 725) (1991).

In light of all of the foregoing, we conclude that the trial court did not err in excluding the disputed letters. *Davis v. State*, 263 Ga. 5, 9 (14) (426 SE2d 844) (1993); *Isaacs v. State*, 259 Ga. 717, 736-737 (37) (386 SE2d 316) (1989).

13. We find no merit in Gissendaner's contention that certain statements made by the Chief Assistant District Attorney in his closing argument during the sentencing phase were improper. The prosecutor did not improperly emphasize the worth of the victim. See *Ward v. State*, 262 Ga. 293, 297 (6) (g) (417 SE2d 130) (1992); *Moon v. State*, 258 Ga. 748, 760 (35) (375 SE2d 442) (1988); *Davis v. State*, 255 Ga. at 606-607, n. 5. Our review of the record also indicates that the prosecutor did not argue things not supported by the evidence, denigrate the place of mercy in the jury's deliberations, or improperly appeal to the passions and prejudices of the jury. Finally, it was not improper for the prosecutor to argue in the manner complained of that ultimate responsibility for any sentence Gissendaner might receive rested on her. *Hance v. State*, 254 Ga. 575, 578 (5) (332 SE2d 287) (1985). Because the arguments complained of were not improper, we conclude that no harm was suffered by Gissendaner, who did not object at trial. See *Todd v. State*, 261 Ga. at 767-768 (2) (a).

14. The trial court's charge on the definition of mitigating circumstances was correct and would not have misled the jury. *Fugate v. State*, 263 Ga. 260, 262-264 (5) (431 SE2d 104) (1993).

The trial court properly charged the jury by stating, "You shall also consider the facts and circumstances, if any, in extenuation and mitigation." See *Romine v. State*, 251 Ga. 208, 214-215 (10) (a) (305 SE2d 93) (1983). The word "may" used later in the trial court's charge referred to whether the jury might consider particular facts and circumstances to be mitigating and not whether, if the jury did consider

them mitigating, they should be considered.

It was not necessary for the trial court to charge the jury that findings regarding mitigating circumstances need not be unanimous or on how mitigating circumstances should be weighed, because the trial court properly charged the jury that it was not necessary to find *any* mitigating circumstances in order to return a sentence less than death. *Palmer v. State*, 271 Ga. 234, 238 (6) (517 SE2d 502) (1999); *McClain v. State*, 267 Ga. 378, 386 (6) (477 SE2d 814) (1996).

The trial court did not err in failing to charge the jury on the consequences of a deadlock. *Jenkins v. State*, 269 Ga. at 296 (26); *Burgess v. State*, 264 Ga. 777, 789 (35) (450 SE2d 680) (1994).

### Constitutional Questions

15. Execution by electrocution is not cruel and unusual punishment. *DeYoung v. State*, 268 Ga. at 786 (6); *Wellons v. State*, 266 Ga. 77, 91 (32) (463 SE2d 868) (1995).

16. Georgia's death penalty statute is not unconstitutional, and Gissendaner has failed to show that application of the statute in her case is unconstitutional. *McCleskey v. Kemp*, 481 U. S. 279 (107 SC 1756, 95 LE2d 262) (1987); *Zant v. Stephens*, 462 U. S. 862, 873-880 (I) (103 SC 2733, 77 LE2d 235) (1983); *Gregg v. Georgia*, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976); *Crowe v. State*, 265 Ga. 582, 595 (24) (458 SE2d 799) (1995). This Court's review of death sentences is neither unconstitutional nor inadequate under Georgia statutory law. *McMichen v. State*, 265 Ga. 598, 611 (25) (458 SE2d 833) (1995); *Felker v. State*, 252 Ga. 351, 381 (14) (314 SE2d 621) (1984).

17. Qualification of jurors based upon their willingness to consider the death penalty as a sentencing option does not deny capital defendants their right to an impartial jury drawn from a representative cross-section of the community and is not otherwise unconstitutional. *DeYoung v. State*, 268 Ga. at 790 (11); *Wainwright v. Witt*, 469 U. S. at 418-426 (II).

18. The Unified Appeal Procedure exists to protect the rights of capital defendants and is not unconstitutional. *Jackson v. State*, 270 Ga. at 498-499 (10).

### Sentence Review

19. Gissendaner contends that the death sentence she received is "disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." OCGA § 17-10-35 (c) (3). Upon a review of the record and of similar cases in Georgia, we conclude that it is not.

(a) Our review of all death sentences includes a special vigilance for categories of cases that have so consistently ended with sentences

less than death that the death penalty in any one case would be clearly disproportionate. *Gregg v. State,* 233 Ga. 117, 126-128 (6) (210 SE2d 659) (1974) (finding the death penalty for armed robbery disproportionate because "rarely imposed" for that crime); *Floyd v. State,* 233 Ga. 280, 285 (V) (210 SE2d 810) (1974) (same); *Jarrell v. State,* 234 Ga. 410, 424-425 (3) (c) (216 SE2d 258) (1975) (same); *Corn v. State,* 240 Ga. 130, 141 (III) (2) (c) (240 SE2d 694) (1977) (same); *Coley v. State,* 231 Ga. 829, 834-836 (I), (II) (204 SE2d 612) (1974) (finding the death penalty for rape of an adult not resulting in death disproportionate to "the past practice among juries" and holding that "if the death penalty is only rarely imposed for an act or it is substantially out of line with sentences imposed for other acts it will be set aside as excessive"); see also *Coker v. Georgia,* 433 U. S. 584 (97 SC 2861, 53 LE2d 982) (1977) (concerning proportionality review of a death sentence under the United States Constitution). However, our review concerns whether the death penalty "is excessive per se" or if the death penalty is "only rarely imposed . . . or substantially out of line" for the type of crime involved and not whether there *ever* have been sentences less than death imposed for similar crimes. *Horton v. State,* 249 Ga. 871, 879 (12) (295 SE2d 281) (1982); *Coley v. State,* 231 Ga. at 834 (I); *Moore v. State,* 233 Ga. 861, 866 (213 SE2d 829) (1975). Consequently, an argument, like one raised by Gissendaner, that a specific defendant in an unrelated murder case received a sentence less than death, while not irrelevant, cannot alone compel a finding of unlawful disproportionality. This Court views a particular crime against the backdrop of all similar cases in Georgia in determining if a given sentence is excessive per se or substantially out of line. When applicable, our "proportionality review of death sentences includes special consideration of the sentences received by co-defendants in the same crime." *Allen v. State,* 253 Ga. 390, 395 (8) (321 SE2d 710) (1984) (citing *Hall v. State,* 241 Ga. 252, 258-260 (8) (244 SE2d 833) (1978)).

We are also directed by OCGA § 17-10-35 (c) (3) to consider "the defendant" in weighing the proportionality of a death sentence, and, therefore, the special individual characteristics of an appellant are appropriate for consideration. See *Corn v. State,* 240 Ga. at 141 (III) (2) (c) (discussing "low mental level and social maladjustment"). Our consideration of "the defendant" also requires a review of the aggravating factors presented at trial, including both past conduct and conduct after the crime.

(b) In considering Gissendaner's role in the murder, we note several aggravating factors from the record. First, the record indicates that she was the moving force in the crime. Owen, her co-conspirator, testified that Gissendaner insisted her husband be murdered rather than divorced so that she would receive insurance money to pay off

the mortgage on her home, although she learned after the murder that no such insurance policy was yet in force. Telephone records indicated that Gissendaner was with Owen when the two made plans for the murder from a bank of payphones and that Gissendaner called or paged Owen 65 times in the days leading up to the murder. On the night of the murder, Gissendaner drove Owen to her family's home, provided him with the murder weapons, and then left him inside the home to lie in wait for her husband while she left to establish an alibi. While out with her friends during the actual murder, Gissendaner resisted suggestions that the group reschedule their outing. When she returned, she immediately sent a numeric signal to Owen on his pager and then drove to the murder scene. Owen testified that she took a flashlight to inspect her husband's body to see that he was dead and assisted in burning her husband's automobile.

Gissendaner's conduct after the night of the murder is also an appropriate concern for our sentence review, as it was an appropriate concern for the jury who sentenced her. Evidence at trial showed that Gissendaner, prior to her arrest, drove angrily toward a witness while declaring, "I ought to run the bitch over." While in jail, she wrote a letter and drew a map of her house in an effort to locate a person willing to accept money to commit perjury and to rob and beat witnesses.

(c) We conclude that the deliberate, even insistent, manner in which Gissendaner pursued her husband's death, the fact that the murder was the unprovoked and calculated killing of a close family member, the fact that she arranged the murder to obtain money, and the fact that she attempted to avoid responsibility for her conduct by suborning perjury and orchestrating violence against witnesses all weigh heavily against her claim that the death penalty in her case is disproportionate. Our review of the sentences imposed in similar cases in Georgia reveals that the death sentence imposed in Gissendaner's case, considering both the gravity of her crime and the apparent depravity of her character, is not disproportionate. OCGA § 17-10-35 (c) (3). The cases appearing in the Appendix support this conclusion in that each involved the careful devising of a plan to kill, killing for the purpose of receiving something of monetary value, kidnapping with bodily injury, or causing or directing another to kill.

(d) Gissendaner also contends her death sentence is impermissibly disproportionate to the sentence received by her co-conspirator. The evidence showed that Gissendaner was the moving force behind the murder and even insisted upon murder when her co-conspirator suggested divorce instead. See *Waldrip v. State*, 267 Ga. 739, 752-753 (25) (482 SE2d 299) (1997) (affirming death sentence when appellant is one among several persons likely to have been moving force, despite life sentence of co-indictees); compare *Hall v. State*, 241 Ga.

at 260 (8). The evidence showed that she repeatedly raised the option of murder in conversations with her co-conspirator and that she planned the murder. She and not her co-conspirator stood primarily to gain financially from the murder. The murder was planned against *her* close family member. See *DeYoung v. State*, 268 Ga. 780. Unlike her co-conspirator, who cooperated with authorities and confessed his guilt, Gissendaner devised a plan to suborn perjury and to do violence against witnesses. Id.; compare *Moore v. State*, 233 Ga. at 865. We also note that Gissendaner appealed to the jury's sense of justice by making the same argument of proportionality she makes to this Court and that the jury rejected the argument by its verdict. In light of all these circumstances, we conclude that Gissendaner's sentence was not impermissibly disproportionate to Owen's. See *Carr v. State*, 267 Ga. at 559 (11); see also *Crowe v. State*, 265 Ga. at 595 (24); compare *Hall v. State*, 241 Ga. at 259-260 (8).

20. We find that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1).

*Judgment affirmed. All the Justices concur, except Fletcher, P. J., who concurs in judgment only as to Division 12; and Benham, C. J., and Sears, J., who dissent as to Division 15.*

## APPENDIX.

*Wilson v. State*, 271 Ga. 811 (525 SE2d 339) (1999); *Mize v. State*, 269 Ga. 646 (501 SE2d 219) (1998); *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997); *Waldrip v. State*, 267 Ga. 739 (482 SE2d 299) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Crowe v. State*, 265 Ga. 582 (458 SE2d 799) (1995); *Tharpe v. State*, 262 Ga. 110 (416 SE2d 78) (1992); *Ferrell v. State*, 261 Ga. 115 (401 SE2d 741) (1991); *Ford v. State*, 257 Ga. 461 (360 SE2d 258) (1987); *Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986); *Alderman v. State*, 254 Ga. 206 (327 SE2d 168) (1985); *Tyler v. State*, 247 Ga. 119 (274 SE2d 549) (1981); *Alderman v. State*, 241 Ga. 496 (246 SE2d 642) (1978); *Smith v. State*, 236 Ga. 12 (222 SE2d 308) (1976).

BENHAM, Chief Justice, dissenting.

While I concur with the majority's affirmance of appellant's adjudication of guilt, I respectfully dissent to Division 15 of the majority opinion and the sentence for the same reasons as stated by Justice Sears in her dissent in *Wilson v. State*, 271 Ga. 811 (523 SE2d 339) (1999).

I am authorized to state that Justice Sears joins in this dissent.

DECIDED JULY 5, 2000 —
RECONSIDERATION DENIED JULY 28, 2000.

Edwin J. Wilson, Steven M. Reilly, Charlotta Norby, Michael Mears, Kenneth D. Driggs, Thomas H. Dunn, for appellant.
Daniel J. Porter, District Attorney, Nancy J. Dupree, Phil Wiley, George F. Hutchinson III, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Frank A. Ilardi, Allison B. Vrolijk, Assistant Attorneys General, for appellee.