## S01A1818. HAYES v. THE STATE.
### (560 SE2d 656)

HINES, Justice.

Roger Dale Hayes appeals his convictions for malice murder, burglary, kidnapping, and theft by taking in connection with the fatal stabbings of his father, Joseph Roger Hayes, and of his step-mother, Kathy Rosemary Hayes. His sole challenge is to the admission of testimony of a child witness. Finding the challenge to be without merit, we affirm.[1]

In December 1997, victim Joseph Roger Hayes ("Roger") and his ex-wife, Desirae Hayes ("Desi") were involved in a custody dispute over their seven-year-old daughter, Erica Marie Hayes. Roger had custody of Erica and she lived with him and his then wife, victim Kathy Rosemary Hayes ("Kathy"), in a mobile home in Rabun County. At that time, Desi was married to appellant Hayes, who was Roger's son, making Hayes Erica's stepfather and half brother.

In the early morning hours of December 9, 1997, Erica was awakened by a commotion in the mobile home. Drew Parsons, who was Roger's grandson, appeared in Erica's bedroom doorway and told her to stay in her room. Erica heard her father Roger reading Bible verses and screaming to call the police. She then heard Hayes ask Roger whether he "wanted to die with a pistol or be chopped up," and ask Kathy whether she wanted to live or die. Erica heard Kathy say that she wanted to live to raise Erica, and Hayes responded that she "said the wrong thing." During these exchanges, Parsons stood guard outside Erica's bedroom door. Afterwards, Parsons and Hayes took Erica from the mobile home, first in Roger's white Monte Carlo and then in Desi's blue Ford Probe; Parsons drove Erica to Desi's house. Erica saw that Hayes was covered in blood.

---

[1] The crimes occurred on December 9, 1997. On December 17, 1997, a Rabun County grand jury indicted Roger Dale Hayes for the malice murder of Joseph Roger Hayes, the malice murder of Kathy Rosemary Hayes, robbery, burglary, the kidnapping of Erica Marie Hayes, and theft by taking a motor vehicle. On January 6, 1998, the State filed a notice of its intent to seek the death penalty. Hayes was reindicted for the same offenses on September 24, 1998. Four days later, the State filed another notice of its intent to seek the death penalty. Following a bench trial May 9-11, 2001, Hayes was found guilty of two counts of malice murder, theft by taking property having a value of $500 or less on the robbery count, burglary, kidnapping, and theft by taking a motor vehicle exceeding $100 in value. On May 11, 2001, Hayes was sentenced to life imprisonment without parole on each count of malice murder following the court's findings of statutory aggravating circumstances pursuant to OCGA § 17-10-30 (b). He was also sentenced to a consecutive 12 months in prison for theft by taking property of $500 or less; 20 years in prison for burglary to be served concurrently with the 12-month sentence; 20 years in prison for kidnapping to be served consecutively with the sentence for burglary; and 20 years in prison for theft by taking a motor vehicle to be served consecutively to the sentence for kidnapping. A notice of appeal was filed on June 6, 2001, and the appeal was docketed in this Court on August 31, 2001. The case was submitted for decision on October 22, 2001.

Still in the early morning hours of December 9, Hayes went to his mother's home. He was crying and related that Roger "had drove him crazy," had made his life "a living hell," and that he thought he had killed Roger and Kathy. Hayes had blood in his hair and on his gloves; he was driving Roger's car.

When police arrived at the crime scene, they found blood stains by the front door and that the telephone lines to the mobile home had been cut. They found the victims in their bedroom, which was covered with blood. A silver-colored cross and pocketknife were on Roger's chest. Roger had sustained 23 injuries, including a wound to the scalp; a stab wound through the ear; cutting wounds across the back and left side of the neck; defensive wounds to the hand; and a large slash to the front of the neck, which had transected the left carotid artery and jugular vein. Kathy had sustained 18 injuries, including bruises to the forehead, a stab wound to the cheek, two stab wounds to the chin, and a defensive stab wound to the arm; her neck had been fatally slashed and stabbed on the front and side, severing her windpipe, her right carotid artery, and jugular vein.

The next day, Hayes was found hiding behind a bed at his mother's home. He stated to police that he had gotten drunk that night and did not remember what had taken place. But he also stated that he hated Roger and did not regret that he was dead.

At trial, Parsons testified for the State that earlier in the evening he had been drinking with Hayes and his friend, Chet Sagner; Hayes threatened Parsons so he went with Hayes and Sagner in Desi's blue Ford Probe to the victims' mobile home; Hayes took a knife from Parsons' back pocket; Hayes opened the door of the victims' mobile home and they went in, leaving Sagner in the car; Parsons went to Erica's room and told her to stay there; Parsons heard Roger speak of forgiving Hayes and then an alarm clock rang; Hayes appeared and gave Parsons the keys to Roger's white Monte Carlo, instructing him to take Erica to her mother's home; Hayes was covered in blood; Hayes later disposed of his clothing and Parsons'; Parsons saw Hayes throw something away on the roadside, which location he later gave to police; and Hayes set fire to Roger's white Monte Carlo.

The police found the burned out Monte Carlo by the roadside, and also a black-handled knife at the roadside location described by Parsons. The DNA of both victims was found on that knife. The knife lying on Roger's body was also analyzed and found to contain Roger's DNA.

Sagner also testified as a State's witness that he was drinking with Hayes and Parsons earlier on the evening of the crimes; they took turns playing with knives, throwing them to see if they would stick in the wall; around 5:00 a.m., Hayes drove Sagner and Parsons

to the victims' mobile home and told them that they were going to kill two people by cutting their throats because someone owed him money; Sagner witnessed Hayes cutting the telephone line to the mobile home; Sagner saw Hayes and Parsons holding knives as they stood outside the mobile home; Sagner got back into the car while Hayes and Parsons went inside; when Hayes and Parsons returned, Hayes was bloody; Hayes brought a little girl to the car, and responded "yes" when Sagner asked him "if he did it"; Hayes threatened to kill Sagner if he told anyone; and Sagner later related what had happened to his father and to the police.

The State presented other evidence that shortly after the crimes, Hayes told others details of how he had cut up his father and his stepmother.

1. The evidence was sufficient to enable a rational trier of fact to find Hayes guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Citing OCGA § 24-3-16,[2] the child hearsay statute, Hayes contends that the trial court committed reversible error by permitting Erica Hayes to testify, because she had not seen, and therefore had not witnessed, the events to which she testified, and that his conviction was based on this improper testimony. But Erica Hayes certainly was a witness to the crimes, albeit primarily through her sense of hearing, rather than of sight. Moreover, Hayes's reliance on OCGA § 24-3-16 is misplaced because the child herself, rather than a third party, testified at trial. The statute governs the admissibility of the hearsay statements of children subjected to abuse. *Gissendaner v. State*, 272 Ga. 704, 715 (12) (532 SE2d 677) (2000). Finally, it can hardly be said that Hayes's convictions were based on Erica's testimony. The State presented ample other evidence of Hayes's commission of the crimes. See statement of facts, supra.

3. Hayes further contends that the trial court committed error by refusing to hold a hearing on the reliability and credibility of Erica Hayes's testimony. He argues that under *Herrington v. State*, 241 Ga. App. 326 (527 SE2d 33) (1999) and *Gregg v. State*, 201 Ga. App. 238 (411 SE2d 65) (1991), the court should have assessed various factors to determine the "indicia of reliability" of Erica's testimony. However the contention and argument are unavailing.

---

[2] OCGA § 24-3-16 provides:

A statement made by a child under the age of 14 years describing any act of sexual contact or physical abuse performed with or on the child by another or performed with or on another in the presence of the child is admissible in evidence by the testimony of the person or persons to whom made if the child is available to testify in the proceedings and the court finds that the circumstances of the statement provide sufficient indicia of reliability.

As to any question of Erica's competency as a witness because of her age (she was nearly 11 years old at the time of trial), a child may be subject to a competency challenge based on the ground that the child does not have the use of reason, but a child is not incompetent as a matter of law based on infancy. OCGA § 24-9-5 (b); *London v. State*, 274 Ga. 91, 93 (549 SE2d 394) (2001); *Norton v. State*, 263 Ga. 448, 449-450 (3) (435 SE2d 30) (1993). There is no assertion of Erica's lack of reason.

Here again, the premise of Hayes's argument is OCGA § 24-3-16. But as already noted, the child hearsay statute addresses the admissibility of a child's out-of-court statements. Out-of-court statements by the child are not at issue here. Consequently, the "indicia of reliability" test set forth in *Herrington* and *Gregg* is inapplicable.

Hayes urges that there were indications that Erica's testimony contained inconsistencies and was contaminated by post-event occurrences such as interviewer bias and fluctuations in memory, and as a result, it lacked both credibility and reliability. But Hayes had the opportunity to demonstrate Erica's alleged lack of reliability and credibility through cross-examination.[3] The resolution of any evidentiary conflicts and inconsistencies, and assessing witness credibility are the province of the factfinder. *Hampton v. State*, 272 Ga. 284, 285 (1) (527 SE2d 872) (2000). Here, the trial court, as factfinder, was authorized to conclude that the child was a credible and reliable witness.

*Judgments affirmed. All the Justices concur.*

DECIDED FEBRUARY 25, 2002 —
RECONSIDERATION DENIED MARCH 25, 2002.

*Michael Mears, William R. Oliver,* for appellant.

*Michael H. Crawford, District Attorney, Thurbert E. Baker, Attorney General, Ruth M. Bebko, Assistant Attorney General,* for appellee.

---

[3] Defense counsel questioned the child specifically about whether anyone had suggested or told her what to say, about her review of prior statements in interviews, and about certain differences in her testimony at the earlier trial of Drew Parsons.