## A02A0839. PULLIN v. THE STATE.
### (572 SE2d 722)

ANDREWS, Presiding Judge.

Stewart Pullin appeals from the denial of his motion for new trial following his conviction by a jury of malice murder, felony murder, voluntary manslaughter, aggravated assault, and burglary. Because the jury convicted him of every crime on the verdict form, including voluntary manslaughter, the lesser included crime of the two murder counts, Pullin was sentenced for voluntary manslaughter, aggravated assault, and burglary.[1]

1. Viewed with all inferences in favor of the verdict, the evidence was that Patricia Williams, former wife of Pullin and mother of his son Rejamel, waked her husband Charles Williams at their home in Lithonia around 6:25 a.m. on December 4, 1998, as she was leaving for work. She also told her 11-year-old daughter, Ruthia, goodbye, went into the garage, opened the garage door, and got in her van. Ruthia then heard a scream and shots.

Ruthia ran downstairs, opened the door from the kitchen into the garage, and saw a tall, thin man wearing a jumpsuit with a name tag on it leaning in the van. She opened the door a little wider, and the man turned around and pointed a gun at her. She then ran upstairs screaming and knocked on Charles Williams' bedroom door.

---

[1] Pullin was sentenced to 20 years on each count, to be served consecutively.

Charles Williams, in his pajamas, along with Rejamel, then 15 years old, and Ruthia ran back to the garage. Williams found the van door open and his wife slumped over, unresponsive, with blood pouring from her face and neck. Williams saw a bullet wound in her temple, one in the lower part of her neck, and brain matter in her hair. A bullet had also entered her lip, shattering her front teeth. Rejamel called 911, and the operator said to try CPR. Although aware his wife was dead, Charles Williams did CPR because the two children were hysterical. Charles Williams' breath was escaping from the hole in his wife's lip and splattering him with her blood.

Patricia Williams suffered two bullet wounds in the left side of her neck, one in her lip, and one in her left ear. Any one of these wounds would have been fatal. There was also a wound on the ring finger of her right hand, which the pathologist opined occurred when she put her hand in front of her face as one of the first bullets fired went through her finger and into her head. Investigators stated that she was shot from close range while the van door was open. The gun was in the van during at least one of the shots, because a spent cartridge was recovered from inside the van. She was shot with a 9 millimeter Makarov, an inexpensive semiautomatic handgun which can be easily purchased on the street.

Pullin and Williams met in high school in Dothan, Alabama, and married there. Pullin was in the Air Force in Washington state. After his and Williams' divorce, child support ($200 per month) for Rejamel was taken out of his pay until he left the Air Force in 1986. Pullin ceased paying support after Williams and Rejamel moved back to Dothan and he was not involved in Rejamel's life, although Rejamel did see Pullin's mother and family in Dothan. In 1994, Williams found Pullin, and he was ordered to pay $250 per month for Rejamel's support, with $50 going to the arrearage.

After marrying Charles Williams and moving to Lithonia, Williams discovered Pullin had a job in Atlanta as a mechanic with Northwest Airlines. In July 1998, she had Pullin served with a petition seeking an increase in the amount of child support to $700. Pullin answered and objected to the increase. Pullin began working for Northwest in July 1994, initially making $12.99 per hour, which had increased to $17.17 per hour by 1998. Pullin, who lived in Stockbridge, was advised by Department of Child Support Enforcement officials that a recommendation was being made to increase his support payment to $744 per month and increase payment toward the $24,700 arrearage to $149 per month, for a total of close to $900 per month.

During the initial hearing on the petition for modification on November 19, 1998, Pullin produced falsified pay stubs from Northwest showing that he made $7.17 per hour. Although he was told by

child support officer Lias that his pay had been checked and they knew it was more than that, Pullin, smug and nonchalant, advised Lias that "[t]his is what I make." Lias was directed by the court to reschedule the hearing and reverify Pullin's wages. Lias told Pullin the reset court date would be December 8, 1998. On November 20, 1998, Pullin was sent written confirmation of this court date.

On November 8, 1998, Patricia Williams found that the garage door of her residence would not open. Charles Williams discovered a broken pane in the door and found that part of the mechanism for the garage door had been removed. He repaired the door opener and filed a report with police. On November 20, 1998, Rejamel came home from school and discovered a window broken out of the back door in the kitchen. Police were called and another report was filed. Charles Williams, upon returning home that evening, found a bullet hole in the kitchen floor. The bullet removed from the floor matched those used to kill Patricia Williams.

On the evening of Patricia Williams' homicide, Ruthia tentatively identified a photo of Pullin from a photo spread as the man she saw in the garage. She had never met Pullin before, although she may have seen pictures of him when he was younger. At trial, Ruthia identified Pullin as the shooter.

Time records of Northwest Airlines revealed that Pullin was not working on November 8, 1998. On November 20, 1998, he did clock in at 5:37 a.m., but he did not clock out. Other mechanics testified that, once job assignments were distributed, mechanics generally worked independently and, if someone left before the end of the shift at 3:42 p.m., no one would likely notice. The business unit manager stated that, once a mechanic checks in, it is assumed that he worked a full shift and pay records indicating that are turned in before lunch.

Pullin was interviewed by police beginning at 5:07 p.m. on the evening of the homicide. He said he had been unable to locate Williams and Rejamel after he got out of the Air Force and he quit paying. After being located in 1994, he was ordered to pay again. After being served in 1998 with the petition to increase his payments, Pullin said he was not upset. Pullin said he called in sick that morning from his Stockbridge home and took his children to school at 7:30 a.m. He denied leaving the house before then and said he had worked on his Toyota Tercel that morning, changing the oil. His wife, however, was quite definite that she had driven the Tercel to work the prior evening. When she arrived home that morning at 9:45 a.m., after her ten-hour shift, Pullin was at their home. Although Pullin denied knowing that Patricia Williams and Rejamel lived in the Atlanta area, his wife said they were aware of that from Pullin's mother. Also, Charles Williams was listed in the phone book.

A search warrant was executed of the Pullin home, and although

a tan/brown jumpsuit was not found; three others were located, one green, one gray, and one blue. A handgun was found, but it was not the weapon used.

Although phone records did not show a call from Pullin's home phone number to Northwest Airlines the morning of December 4, 1998, cell phone records showed that a call was made from Pullin's cell phone to Northwest Airlines at 5:32 a.m. on December 4. According to expert testimony,[2] this call originated in Lithonia near the Williamses' residence and could not have been made from the Stockbridge area. A second call was made at 7:10 a.m., although not answered, to Pullin's home phone number as his cell phone was tracked heading back toward Stockbridge. Closer to Stockbridge and shortly after the second call, a third call from the cell phone was made to Pullin's home phone number.

The evidence was legally sufficient. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Pullin contends that the trial court's allowance, under the necessity exception to the hearsay rule, of testimony of Marsha Davis regarding statements made to her by the victim following the two November incidents was error because there was an insufficient showing of reliability.

Davis had been Patricia Williams' supervisor for three weeks prior to her death at Williams' second job, and Davis testified that the two women confided in one another. Williams told Davis that she thought someone was trying to break into her home and she was upset because, after the second incident, her children had gone into the house and discovered the break-in. She was concerned about their safety, and Davis and she discussed alarm systems. Williams told Davis police reports were made, but she did not feel police had done enough regarding the incidents. Williams also told Davis about the bullet in the kitchen floor following the second incident. The two patrol officers who took these reports testified at trial, but had no recollection of the incidents independent of their reports.

Davis spoke to police regarding Williams' statements either the day of Williams' death or the next day. Davis had not talked to Charles Williams about these incidents and had met him only once when he came by the shop.

During the cross-examination of Charles Williams, Pullin's counsel brought out a number of inconsistencies in his testimony about the November incidents and what was contained in the police reports, particularly the fact that there was no mention in the second

---

[2] In *Pullin v. State*, 272 Ga. 747 (534 SE2d 69) (2000), an interlocutory appeal in this case, it was determined that the scientific procedure used to track cell phone calls could be verified with such certainty that it was competent evidence in a court of law.

incident report of a bullet hole. As acknowledged by appellate counsel, Pullin's trial counsel was developing a theory that Charles Williams had opportunity and motive to kill his wife[3] and that he had concocted these November incidents to divert attention from himself.

> For a statement to be admitted under OCGA § 24-3-1 (b), there must be particularized guarantees of trustworthiness. *Abraha v. State*, 271 Ga. 309, 313 (2) (518 SE2d 894) (1999). In other words, there must be something present which the law considers a substitute for the oath and cross-examination of the declarant. *White v. State*, 268 Ga. 28, 29 (2) (486 SE2d 338) (1997). . . . However, the circumstances which demonstrate the reliability of hearsay statements will vary depending on the nature of the statement, and therefore, the determination of trustworthiness is "inescapably subjective." *Gissendaner v. State*, 272 Ga. 704, 711 (6) (532 SE2d 677) (2000). Consequently, the trial court's determination will not be disturbed absent an abuse of the court's discretion. Id.

*Thomas v. State*, 274 Ga. 156, 162 (8) (549 SE2d 359) (2001).

The two cases relied upon by Pullin are distinguishable from the present situation. In *Slakman v. State*, 272 Ga. 662 (533 SE2d 383) (2000), admission of statements of the victim to co-workers that she wanted a divorce from Slakman because he lied to her, hid bills from her, and mentally and physically abused her was found erroneous because she had known the co-workers only a short period before she began confiding about problems in her marriage and there was the possibility of exaggeration or falsity.

Here, Davis testified there was a confidential relationship even though she and Williams had known each other only three weeks. Also, there is nothing to suggest any reason why Williams would exaggerate or falsify incidents involving break-ins of her home.

In *Carr v. State*, 267 Ga. 701 (482 SE2d 314) (1997), also cited by Pullin, Carr was charged with murdering his wife. Numerous witnesses, including the wife's lover, were allowed to testify concerning the wife's statements to them which related to Carr's possible motive for murdering his wife. As concluded there, statements by one married partner to confidantes to whom an extramarital affair had already been confessed "are subject to doubt in that the need to justify the act of adultery might well lead to untruthfulness." Id. at 706 (3). No basis for Mrs. Williams to fabricate anything about the break-ins has been suggested.

---

[3] He collected on a life insurance policy on her life.

In *Thomas v. State*, supra, a short period of friendship was found to be sufficient indicia of trustworthiness. We find no abuse of the trial court's discretion in finding that trustworthiness here.

Further, even were we to conclude that the allowance of Davis' testimony was error, we find it harmless. Discussion by Mrs. Williams of her concerns regarding the break-ins did nothing to undermine Pullin's contentions that Mr. Williams had faked the two incidents. Also, Davis' testimony did not implicate Pullin in any way. See *Willis v. State*, 274 Ga. 699, 700 (2) (558 SE2d 393) (2002); *Todd v. State*, 274 Ga. 98, 100 (3) (549 SE2d 116) (2001).

3. In his second enumeration of error, Pullin contends the trial court's denial of his motion for mistrial because of the State's closing argument was error.

> "The decision of whether to grant a mistrial because of improper conduct by counsel rests with the trial judge. (OCGA § 17-8-75). [Her] decision will not be overturned . . . absent a manifest abuse of discretion. (Cit.)" *Jones v. State*, 250 Ga. 166, 168 (3) (296 SE2d 598) (1982). See also *Johnson v. State*, 142 Ga. App. 526 (1) (236 SE2d 493) (1977). " '(T)his court has repeatedly held that if the trial judge acts immediately, and in the exercise of [her] discretion takes such action as in [her] judgment prevents harm to the accused as a result of such improper statements, a new trial will not be granted unless it is clear that such action failed to eliminate from the consideration of the jury such improper statements. (Cits.)' (Cit.)" *Walker v. State*, 132 Ga. App. 274, 275 (3) (208 SE2d 5) (1974).

*Grant v. State*, 185 Ga. App. 497-498 (1) (364 SE2d 628) (1988). See also *Thomas v. State*, 254 Ga. App. 129 (561 SE2d 468) (2002).

In her closing argument, the prosecutor stated, "[w]e talked about motive, and we talked about the identification. It's very important that you need to think about opportunity, and the opportunity is an absolutely crucial link in this case that Stewart Pullin has absolutely nothing to comment about. In fact, [defense counsel] stood up and said. . . ." At this point, defense counsel moved for mistrial, contending this statement was an improper comment on Pullin's right to remain silent. In explanation, the prosecutor explained that

> if I had been allowed to finish my sentence, I was specifically referring to the fact that [defense counsel] stood up and said, we stipulate to this evidence [that Pullin could not have made the cell phone calls from his Stockbridge home]. . . . [T]he defense's comment on this evidence that I was about to

refer to is that they stipulated that this is a fact, and that is what I was referring to. . . . [I]f I would be allowed to finish that statement, because [defense counsel] actually stood up and interrupted my expert on the cellphone evidence, interrupted him to say, . . . we stipulate to this evidence, and that, if I had finished the sentence, is exactly what I meant, and that is exactly where I was going. . . .

The trial court denied the motion for mistrial, apparently concluding, pursuant to *Ranger v. State*, 249 Ga. 315 (290 SE2d 63) (1982), that it was not the prosecutor's manifest intention to comment upon Pullin's failure to testify, nor was the statement " ' "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." ' " Id. at 319. Nonetheless, the court instructed the jury, with Pullin's acquiescence,[4] as follows:

I want to take an opportunity to remind you again that a defendant in a criminal case is under no duty to present any evidence tending to prove innocence and is not required to take the stand and testify in the case. Whereas [sic] here a defendant elects not to testify, no inference, hurtful, harmful, or adverse to the defendant, shall be drawn by you, the jury, nor shall such fact be held against the defendant in any way.

The prosecutor then resumed her argument concerning the cell phone evidence and the fact that the defense stipulated to it.

There was no error in denial of the mistrial. "We have expressly recognized that the State has the right to argue that the defense failed to rebut or contradict evidence demonstrating guilt. [*Perry v. State*, 232 Ga. App. 484, 487 (2) (b) (500 SE2d 923) (1998)]." *Thomas v. State*, supra, 254 Ga. App. at 130.

4. Pullin's third enumeration is that the trial court erred in "denying Appellant's challenge for cause of prospective juror number 19 [Roemer]."

A review of the record, however, reveals that, when asked if there were any challenges for cause, defense counsel stated, "[n]o, ma'am." Thus, there is nothing in this regard for us to review. *Passmore v. State*, 274 Ga. 200, 202 (5) (552 SE2d 816) (2001).

*Judgment affirmed. Phipps and Mikell, JJ., concur.*

---

[4] He also renewed his motion for mistrial.

DECIDED OCTOBER 17, 2002.

*Virginia W. Tinkler*, for appellant.

*J. Tom Morgan, District Attorney, Jeanne M. Canavan, Assistant District Attorney*, for appellee.