46457. DUNCAN et al. v. THE STATE.
(379 SE2d 507)

SMITH, Justice.

Appellants Lawrence Robert Duncan and wife Margaret Jennie Gass Duncan were charged with possession of marijuana and possession of a controlled substance, diazepam, found in a search of their car. Mrs. Duncan was additionally charged with three counts of possession of controlled substances and two counts of possession of dangerous drugs relating to loose pills found in her purse, as well as counts of carrying a pistol without a permit and carrying a concealed weapon. Mr. Duncan was charged as a recidivist. The Court of Appeals denied an application for interlocutory appeal of an order of the Superior Court of Chatham County in which appellants' amended motion to suppress evidence seized as a result of a wiretap was de-

nied. This Court granted certiorari, and we reverse.

1. Suspecting appellants of trafficking in controlled substances, an agent of the Georgia Bureau of Investigation launched an extensive inquiry into their activities. The agent discussed appellants with other law enforcement officers, all of whom expressed suspicions about appellants. Determining from these contacts that appellants had been in contact with various "known violators," the agent set out to gather more information.[1]

The agent approached the District Attorney for the Lookout Mountain Judicial Circuit for advice on how to obtain documentary evidence of appellants' activities. The District Attorney directed the agent to prepare Dade County "subpoenas" styled "State of Georgia versus Lawrence R. Duncan," even though no such case had been filed in Dade County.[2] The agent prepared these "subpoenas" and took them to the Clerk of the Superior Court, who signed them without checking to see whether or not such a case was actually pending. Using these "subpoenas," the agent obtained copies of the appellants' telephone toll records[3] as well as Mr. Duncan's hospital records from an earlier shooting incident.[4]

The agent analyzed the telephone toll records and found that appellants' telephone had been used to call other suspected drug violators. The agent testified that, hoping "to gather as recent information that would constitute probable cause as [he] could," he then typed up an authorization order for the installation of a pen register on the appellants' home telephone and took it to a judge of the Lookout Mountain Judicial Circuit. The agent orally explained his suspicions about the appellants to the judge, including Mr. Duncan's criminal history, the information obtained from other law enforcement personnel, and the information gleaned from the "subpoenaed" telephone toll records. The judge signed the order on February 1, 1983, authorizing the installation of a pen register for twenty days. The agent installed the pen register and did not seek an extension order at the end

---

[1] Almost from its inception, this investigation offers a fine example of how an investigation should not be conducted. Law enforcement by deceit is not desirable.

[2] Apparently this had been standard operating procedure in Dade County for some time. The agent testified at the hearing on the motion to suppress that he had used this technique in several cases. The Court of Appeals condemned the use of these "bogus subpoenas" in an earlier appeal in this case, Van Nice v. State, 180 Ga. App. 112 (348 SE2d 515) (1986).

[3] The "subpoena" served on the president of the telephone company stated, "In lieu of an appearance in Court said records may be turned over to GBI Special Agent Brad Bonnell." We can only wonder what would have happened if, in lieu of turning over the records to Agent Bonnell, the president of the telephone company had attempted to make an appearance in court.

[4] This "subpoena" was served by the agent on a hospital located in Chattanooga, Tennessee, although the agent admitted he has no authority to serve even a bona fide subpoena outside of the State of Georgia.

of twenty days. On February 22, 1983, the pen register recorded a call placed from the Duncan residence to the telephone of Gass. On February 23, 1983, the pen register recorded a call from the Duncan residence to the telephone of Smith.

Assisted by two members of the Prosecuting Attorneys Council of Georgia, the agent prepared all of the documents required for the installation of a wiretap, including the agent's affidavit in support of the application, the application itself, and the investigation warrant to be signed by a judge. In the affidavit, the agent specifically relied on the pen register record of the February 22 and February 23 calls to Gass and Smith. On March 10, 1983, the agent took these documents to the District Attorney, who, after questioning the agent about the contents of the affidavit, signed the application which had been prepared in his name. Then the agent, the agent's supervisor, the District Attorney, the Chief Assistant District Attorney, the District Attorney's investigator, and the two members of the Prosecuting Attorneys Council all went to the home of a second judge in the Lookout Mountain Judicial Circuit. This judge placed the agent under oath, and the agent testified as to the contents of his affidavit. The judge signed the investigation warrant, and a wiretap was placed on the appellants' home telephone.

The agent's affidavit (as well as his testimony to the second judge based on the affidavit) included a large number of inaccuracies and exaggerations,[5] many of which the agent eventually admitted he had

---

[5] a. The agent had talked with another agent who told him that during an investigation of Charles Fleming, Mr. Duncan was identified as an associate of Fleming. In the affidavit, the agent represented that Fleming had a prior record of murder and that he had been indicted as a co-conspirator in a recent drug case involving his son, neither of which is true. The affidavit stated that this information came from the other agent, but the other agent later testified that he never told the agent either of these things.

b. The affidavit contained much information about the appellants attributed to confidential informants "A," "B," "C," and "D." The agent stated in the affidavit that these informants had previously given information leading to numerous other arrests, and he gave detailed descriptions of the persons arrested and the crimes with which they were charged. However, the agent "didn't see any need" to tell anyone relying on the affidavit that every person listed in the affidavit as having been arrested by virtue of information provided by the confidential informants had either been acquitted or had the charges dropped.

c. Mr. Duncan had previously been shot at his home in Dade County. The agent stated in his affidavit that "Duncan failed to report the incident to the Dade County Sheriff's Office." However, the Dade County Sheriff later testified that Mrs. Duncan's daughter had reported the shooting and that the agent's statement in the affidavit was misleading.

d. Also in regard to the shooting incident, the agent stated in his affidavit that Investigator Paul Griffin, the District Attorney's investigator, had advised the agent that he had learned from an informant with "direct personal contact with the participants in the incident" that Mr. Duncan was shot as a result of failing to pay for a shipment of marijuana. The agent later admitted that he had misunderstood Griffin and that the informant was not involved with any of the participants in the shooting. The agent improperly attributed several other pieces of information to Griffin. The District Attorney later testified that he had relied on seeing Griffin's name in the affidavit and that this was a factor in his belief in the reliability

not thoroughly checked out. The agent later admitted that a great deal of the information contained in the much relied-upon affidavit was either misleading or false.

During the course of the wiretap investigation, a call was intercepted from "Raoul" to Mr. Duncan in which Duncan was instructed to come to Savannah to pick up an order. Agents followed the Duncans to Savannah and observed their activities. Appellants and their co-defendants were subsequently arrested. A search of their cars yielded the contraband for which appellants now face charges.

2. We are guided to a decision in this case by the prior case of *Ellis v. State*, 256 Ga. 751 (353 SE2d 19) (1987). In *Ellis*, we held that a pen register is a "device" as defined in OCGA § 16-11-60, the use of which requires a properly issued warrant under state law. *Ellis*, supra, 256 Ga. at 754; OCGA §§ 16-11-62; 16-11-64. OCGA § 16-11-64 regulates the interception of wire or oral transmissions by law enforcement officers and sets out very specific procedures for obtaining a warrant for such "devices." Although the GBI agent did obtain an authorization order before installing the pen register on appellants' telephone, he did not follow those necessary procedures in doing so.

> *When there is probable cause* to believe that a person is committing or has committed [certain crimes], then, upon *written application*, under oath, *of the district attorney of the circuit wherein the device is to be physically placed, or the Attorney General*, . . . any judge of the superior court of the circuit aforesaid may issue an investigation warrant per-

---

of the information.

e. The agent stated in his affidavit that the Duncan residence was surrounded by a "fortification." The Sheriff of Dade County later testified that this consisted of a log split-rail fence with one section of regular chain link.

f. The agent stated in his affidavit that Mr. Duncan was arrested in 1974 along with Fred Gomez and Willie Waldie. Left undisclosed is the fact that charges against all three were dismissed. In the actual application for the wiretap (prepared by the agent), Gomez and Waldie are listed as persons actively involved in criminal enterprises with Mr. Duncan, as persons who "are committing and are about to commit" violations of the Georgia Controlled Substances Act, and as persons whose telephone conversations are to be monitored. Both Gomez and Waldie had been dead for several years prior to the date of the wiretap application.

g. The agent included in the affidavit information gleaned from the subpoenaed telephone toll records and from the pen register regarding frequent calls placed to the residence of Smith in Chattanooga, Tennessee. The agent stated that Smith has been identified as a "major drug trafficking violator." Left undisclosed is the fact that Smith is Mrs. Duncan's son-in-law and that the telephone calls were between Mrs. Duncan and her daughter. Furthermore, Smith later testified without contradiction that he works for a yogurt company, that he has never been arrested, that he is a veteran with an honorable discharge, that he does not drink or use drugs, and that he is a regular member of the Tiftonia Baptist Church, where he serves on the school board and is the Assistant Sunday School Superintendent. This was all corroborated by a deacon at the church.

mitting the use of devices, as defined by Code Section 16-11-60, for the surveillance of such person or place. . . . [Emphases supplied.]

OCGA § 16-11-64 (b) (1) (1988).

The agent admits that he did not have probable cause before installing the pen register and that it was used in order to *establish* probable cause for installation of the wiretap. Furthermore, in obtaining the authorization order for the pen register on appellants' telephone, the GBI agent orally applied to the judge rather than properly taking his allegations to the district attorney or the Attorney General. The agent's failure to follow the mandated procedure for obtaining a warrant negated the legal effect of the document he did obtain and caused the pen register to be illegal under the requirements of *Ellis*. Since the affidavit and application for the wiretap relied upon tainted information from the illegal pen register, then any evidence gathered as a result of the wiretap was also tainted under the "fruit of the poisonous tree" doctrine, *Nardone v. United States*, 308 U. S. 338 (60 SC 266, 84 LE 307) (1939), and it should have been suppressed.

3. The motion to suppress should also have been granted due to the GBI agent's use of the pen register beyond the time limits stated on the face of the authorization order. A judge may only issue a warrant "provided the warrant specifies with particularity the . . . duration . . . of use permitted . . ." OCGA § 16-11-64 (b) (1); furthermore, "investigation warrants . . . shall be valid for no more than 20 days *after issuance*, unless renewed. . . ." (Emphasis supplied.) OCGA § 16-11-64 (b) (3). In this case, the judge's February 1 order directed that use of the pen register should cease "in any event" at midnight on February 21, thereby allowing the agent the full twenty days. However, the agent continued to operate the pen register beyond the stated time limitation without seeking any renewal of authorization, thereby causing any information seized during the unauthorized days to be illegal. Since the agent included the two illegally seized calls to Gass and Smith in the affidavit relied upon in the application for the wiretap, any evidence gathered as a result of the wiretap should have been suppressed. The State's argument that the GBI agent's use of the pen register was legal since he only actually used it for twenty days *from the date he installed it* ignores the plain language of the trial judge's order as well as that of OCGA § 16-11-64 (b) (3).

*Judgment reversed. All the Justices concur, except Hunt, J., who concurs in the judgment only, and Marshall, C. J., and Gregory, J., who dissent.*

DECIDED MAY 25, 1989 —
RECONSIDERATION DENIED JUNE 22, 1989.

*Jones, Bordeaux & Assoc., John Wright Jones, Noble L. Boykin, Jr.,* for appellants.

*Spencer Lawton, Jr., District Attorney, David T. Lock, Assistant District Attorney,* for appellee.