# S99A0322. ABRAHA v. THE STATE.
## (518 SE2d 894)

HINES, Justice.

Arega Abraha was sentenced to life in prison after a jury found him guilty of malice murder and felony murder while in the commission of aggravated assault for the fatal shooting of his cousin, Aster Haile. Abraha appeals, challenging the sufficiency of the evidence of his guilt, the refusal to suppress the results of an executed search warrant for his automobile, and the admission into evidence of certain of the victim's statements. Finding the challenges to be without merit, we affirm.[1]

The evidence construed in favor of the verdicts showed that on January 14, 1997, between 9:30 p.m. and 10:00 p.m., a motorist found Aster Haile's body on the side of State Highway 78 near the Memorial Drive exit in DeKalb County. Haile was dead as the result of a contact gunshot wound to the middle of her forehead. The motorist who discovered Haile had left a stranded vehicle at the spot between 5:30 p.m. and 6:00 p.m. that evening and had seen no sign of the woman's body at that time. When the medical examiner's forensic investigator arrived at the scene, Haile's body was still warm and its appearance was consistent with Haile having been alive at the time the motorist's vehicle broke down.

Haile and Abraha were both from Ethiopia and Haile came to the United States as the result of Abraha's assistance; a pretextual marriage for Haile was arranged with an Ethiopian friend of Abraha's who had American citizenship. Although Abraha and Haile were cousins, he called her his "sister" and she referred to him as her "brother." Once in the United States, Haile quickly ended the sham marriage, and she became roommates with a man she had met in a refugee camp in Kenya. Haile's former husband made demands on Haile and Abraha to return certain monies and jewelry he had apparently given in the marriage. This upset and angered Abraha. Also, Haile's fraudulent marriage resulted in the termination of her conditional residency status in December 1995. Haile feared deportation; she also feared Abraha. Haile told her friend and neighbor Gebrewid that she was afraid that if Abraha knew she had some

---

[1] The murder was committed on January 14, 1997. On April 4, 1997, a DeKalb County grand jury indicted Abraha for malice murder and felony murder. Abraha was tried on December 8-16, 1997, and was found guilty on both counts. He was sentenced on December 16, 1997, to life imprisonment for the malice murder. The felony murder stood vacated by operation of law. Abraha filed a pro se motion for new trial on January 8, 1998, and new counsel filed an amended motion for new trial on October 2, 1998. A new trial was denied on October 5, 1998. The notice of appeal was filed on November 4, 1998, and the case was docketed in this Court on November 23, 1998. The appeal was submitted for decision without oral argument on January 11, 1999.

money in savings, he would kill her.

At the end of December 1996, Abraha borrowed a handgun from his friend Farrah, telling him that he needed it for protection on a camping trip.

In January 1997, Abraha arranged for Haile to meet a prospective husband. Haile told Gebrewid, and another friend, Hussein, about the prospect, and on Saturday, January 11, 1997, Haile and a friend went shopping for suitable clothes for Haile to wear for the meeting with the man. Haile related what she had been told by Abraha, that the man, who was an American citizen, was a little older, religious, and financially secure. Haile met with Abraha and the man the next day, Sunday, January 12, 1997. After the meeting, Haile told her friends that the man was Caucasian, rich, and very old compared to her, and that she did not want to marry him but felt that she had no other choice.

On the morning of January 14, 1997, Haile went to her housekeeping job. After returning home around 11:00 a.m., Haile told Gebrewid that she had just spoken with Abraha and they were going to meet with the potential suitor for lunch about 1:00 p.m. Haile then left, stating that Abraha was coming to pick her up on Buford Highway. Gebrewid last saw Haile walking toward Buford Highway at approximately 12:30 p.m. Evidence showed that a telephone call was placed from Haile's apartment to Abraha's residence at 12:15 p.m. Haile's body was found in the same clothes she was wearing when last seen leaving her apartment at 12:30 p.m.

On January 15, 1997, Abraha returned the borrowed gun to Farrah. Also, that day Abraha took his body damaged car to a repair shop, insisting that he leave the vehicle. But the owner refused, and Abraha returned with the car the next day, January 16. Abraha seemed nervous and talked to the owner about selling his car.

Also on January 16, the police told Abraha about Haile's death; Abraha displayed no reaction to the news or any curiosity about the circumstances. He agreed to be interviewed by police. Abraha claimed not to have seen Haile on January 14, 1997, and stated that on that day he was running and later visited an athletic club in the evening, returning home between 8:50 p.m. and 9:50 p.m. However, the athletic club's records reflected that Abraha was present only on the morning of January 14 at 9:45 a.m. Police obtained a warrant to search Abraha's car, and even though it appeared that there had been an attempt to clean the vehicle, traces of Haile's blood was found throughout. Marijuana was also discovered in the car. After learning of Haile's death, Farrah turned over to police the gun he loaned to Abraha. Haile's blood was found on the gun, and the bullet removed from her brain was determined to have been fired from the weapon.

Police obtained a warrant for Abraha's arrest, but he fled the state. Abraha was apprehended on a fugitive warrant on January 24, 1997 at an airport in Kentucky. He was found with $34,000 in cash, an airline ticket which would have taken him next to Chicago, and receipts indicating that he had made $32,500 in cash advances on his credit cards.

1. Abraha contends that the trial court erred in refusing to grant his motion to suppress the evidence obtained from the search of his car because the issuing magistrate lacked probable cause for the warrant. See OCGA § 17-5-21 (a). But that is not the case.

In determining probable cause for a search warrant, the magistrate is merely to

> "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the magistrate], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

*DeYoung v. State*, 268 Ga. 780, 787 (7) (493 SE2d 157) (1997), quoting *State v. Stephens*, 252 Ga. 181, 182 (311 SE2d 823) (1984). The trial court will then examine the issue, and its factual findings regarding probable cause for issuance of the warrant will be upheld unless clearly erroneous. *Bryant v. State*, 268 Ga. 616, 618 (6) (491 SE2d 320) (1997); *Williams v. State*, 267 Ga. 771 (4) (482 SE2d 288) (1997). Ultimately, this Court's role on review is to "determine if the magistrate had a 'substantial basis' for concluding that probable cause existed to issue the search [warrant]."[2] *DeYoung* at 787 (7). See also *Grier v. State*, 266 Ga. 170, 172 (2) (b) (465 SE2d 655) (1996). And a reviewing court is to give substantial deference to the magistrate's decision to issue a search warrant after finding probable cause. Id.

Here, there was a substantial basis for finding the existence of

---

[2] In *Ornelas v. United States*, 517 U. S. 690 (116 SC 1657, 134 LE2d 911) (1996), the United States Supreme Court adopted a more stringent standard for appellate courts to use when reviewing a finding of probable cause on a *warrantless* search. The Court stated that, in the context of warrantless searches, "determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." *Ornelas v. United States*, 517 U. S. at 699. However, the standard of review applied to warrantless searches is clearly distinguished from that applied to searches made pursuant to a warrant. The Court reasoned that a stricter standard was required when reviewing a probable cause finding on a warrantless search. Reiterating the strong preference for the use of search warrants under the Fourth Amendment, the Court stated that, "the police are more likely to use the warrant process if the scrutiny applied to a magistrate's probable-cause determination to issue a warrant is less than that for warrantless searches. Were we to eliminate this distinction, we would eliminate the incentive." Id.

probable cause. The police searched Haile's apartment. The detective who obtained the warrant interviewed Haile's roommates, friends, neighbors, and one of her employers and learned that on the day in question Haile was to meet with Abraha shortly after she was last seen. The interviewees spoke of Abraha as Haile's brother. The detective then interviewed Abraha, who volunteered that his car was in the body shop. Abraha also denied that he had seen Haile on January 14.

The detective's affidavit in support of the warrant for Abraha's car, which was made on January 16, 1997, recited that: On January 14, 1997, DeKalb County police were called to investigate a body found on the Highway 78 connector to Memorial Drive; the police found the body of an unidentified female, laying just off the roadway on the west bound lane side; she had sustained a gunshot wound to the head and it appeared as though the body had been dumped at the location; on January 15, the body was positively identified as Haile; detectives learned through interviews with her employer that Haile was scheduled to meet with Haile's brother, Abraha, to take Haile's vehicle in for repair work; interviews with Haile's neighbor revealed the fact that Haile was last seen by the neighbor at approximately 12:00 p.m. when Haile dropped by the neighbor's apartment; at that time Haile stated to the neighbor that she had an appointment to meet her brother, Abraha, that day; the neighbor described Haile as wearing a black short skirt, black shoes, and carrying a black purse with gold trim; such clothing description was the same as Haile was discovered wearing when detectives arrived at the crime scene; the described black pocketbook was not located; on January 16, 1997, detectives arrived at Abraha's residence, and spoke with his fiancée; the fiancée stated that Abraha was not at home but should return shortly; while the detectives were speaking with the woman, Abraha arrived on foot; Abraha stated that he was returning from dropping his vehicle off at a body shop; a computer check revealed the car's vehicle identification and tag numbers.

As the detective concluded in the affidavit, due to the facts that Haile was believed to have last been alive on January 14, 1997, that Haile made statements to witnesses that she was scheduled to meet with her brother Abraha later that day, and that Haile's body, which appeared to have been dumped by the side of the roadway, was discovered clad in the same type clothing as she was seen wearing on January 14, 1997, there was probable cause to believe that evidence of Haile's murder would be found in Abraha's vehicle, and issuance of the warrant was authorized.

2. Abraha likewise fails in the contention that the trial court committed reversible error when it allowed the admission of statements allegedly made by Haile to Hussein and Gebrewid. After a pre-

trial hearing, the court admitted the statements under OCGA § 24-3-1 (b), the necessity exception for the admission of hearsay evidence. Use of the exception requires first that necessity exist. This requirement is satisfied when the declarant is deceased. *Roper v. State*, 263 Ga. 201, 202 (2) (429 SE2d 668) (1993). There must also be particularized guarantees of trustworthiness, that is, things that will be deemed to substitute for the declarant's oath and the declarant's cross-examination by the party against whom the hearsay is offered. *White v. State*, 268 Ga. 28, 29 (2) (486 SE2d 338) (1997); *Mallory v. State*, 261 Ga. 625, 627 (2) (409 SE2d 839) (1991). Moreover, showing that the subject statement is relevant to a material fact and more probative of such fact than other evidence provides additional assurance that the necessity exception is not misused. *Chapel v. State*, 270 Ga. 151, 155 (4) (510 SE2d 802) (1998).

In this case, the statements to Hussein and Gebrewid were relevant to the critical facts of Haile's reluctance about the marriage Abraha was arranging for her, an apparent motive for the killing, and of Haile's plan to meet with Abraha on the afternoon of her murder, and were more probative of these facts than any other available evidence. The statements also bore sufficient indicia of reliability and trustworthiness. As the trial court found, both Hussein and Gebrewid were demonstrated to be Haile's good friends and confidants. Gebrewid was Haile's next-door neighbor for about a year. Haile talked daily with Gebrewid about her romantic and immigration problems, her desire to get married, and about Abraha's plan to find Haile a husband so that she could remain in the country legally. Haile had confided to Gebrewid about her previous meeting with the suitor, and it was to Gebrewid's apartment that Haile came the day of her death, acting nervous and revealing her plan to meet Abraha.

Hussein had known Haile for more than three years, and saw her often. Haile and her boyfriend lived with Hussein at one point. Haile also continuously discussed her romantic and immigration problems with Hussein. Haile told Hussein that she was looking for a husband so that she could stay in this country legally. Haile went shopping with Hussein for the new clothes to meet her potential suitor several days before Haile's death. Haile also told Hussein about her meeting with the prospective husband and her dilemma in not wanting to marry the man but needing to become a legal resident.

The statements made to Gebrewid were in accord with those made to Hussein, and Gebrewid's and Hussein's relating of Haile's statements remained materially consistent from the time of their initial interviews with investigators through trial. The statements were also consistent with the physical evidence of the murder. That Haile did not tell her male roommates, one of whom was her ex-boyfriend,

about her plan to meet Abraha on the day of the murder, and that Haile told her employer that she was meeting Abraha to get her car repaired does not contradict and is not inconsistent with Haile's statements about Abraha's marriage scheme and her planned meeting with him during the critical time frame. Compare *Mallory v. State,* supra. What is more, Haile lacked any motive for fabricating these statements to her close friends. *Chapel v. State,* supra at 155 (4). The evidence was properly admitted.

3. The evidence was sufficient to authorize any rational trier of fact to find Abraha guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed. All the Justices concur, except Carley, J., who concurs in Divisions 2 and 3, and in the judgment.*

DECIDED JULY 6, 1999.

*Gayle D. Bacon,* for appellant.

*J. Tom Morgan,* District Attorney, *Barbara B. Conroy, Robert M. Coker,* Assistant District Attorneys, *Thurbert E. Baker,* Attorney General, *Paula K. Smith,* Senior Assistant Attorney General, *Daniel G. Ashburn,* Assistant Attorney General, for appellee.