## S02A1350. WRIGHT v. THE STATE.
(579 SE2d 214)

HINES, Justice.

Gerald Wayne Wright appeals from his convictions on two counts of malice murder, one count of possession of a firearm during the commission of a felony, and one count of concealing the death of another, all in connection with the death of his wife, Beverly Wright,

---

and his friend, Richard Hudson.[1] For the reasons that follow, we affirm.

Construed to support the verdicts, the evidence showed that Gerald Wayne Wright ("Wright") and Beverly Wright ("Beverly") resided in Dade County and had been married for almost 25 years when they separated in March of 2000; Wright left the house. Soon thereafter Wright filed for divorce. There were attempts to reconcile, but no positive resolution. In mid-June 2000, Beverly saw Wright enter the Villager Motel with another woman. Parked outside the motel, Beverly, using her cellular telephone, called Wright on his cellular telephone and asked if the couple would like to exit the motel for a photograph. Wright left the room, still speaking on his telephone, and approached Beverly. She drove away and he drove after her, eventually forcing her off the road. He walked up to her car and demanded the camera on the front seat. She refused; he went to his car for a metal object and threatened to break her window. Beverly lowered the window and Wright reached in over her and took the camera. Beverly's telephone call to 911 about the incident was recorded.

On June 29, 2000, in a final attempt to save the relationship, Wright and Beverly went to a marriage counselor. Shortly after entering the session, Beverly stated that she had no desire to reconcile, and left. That afternoon, Wright went to Beverly and told her that if she brought a man into "his" house, he would kill her. That evening, he asked his friend Richard Hudson to talk with Beverly and try to persuade her to take Wright back, a role in which Hudson had previously served. Late that night, Wright went to the marital home where Beverly continued to reside, and discussed the matter with Hudson and Beverly. Wright left to get some cigarettes. Upon returning, he discovered Hudson and Beverly lying on the bed in the master bedroom. Wright had a disposable camera and took a photograph of the two in what Wright described as an embrace in which

---

[1] The victims were killed on June 30, 2000. On October 9, 2000, a Dade County grand jury indicted Wright on two counts of malice murder, two counts of felony murder in the commission of aggravated assault, two counts of aggravated assault, one count of possession of a firearm during the commission of a felony, and one count of concealing the death of another. He was tried before a jury on January 29-February 6, 2001, and found guilty on all counts. On February 6, 2001, Wright was sentenced to two consecutive terms of life in prison for the malice murders, to a consecutive term of five years in prison for possession of a firearm during the commission of a felony, and a term of five years in prison for concealing the death of another, to be served concurrently with the two life terms; the aggravated assaults merged with the felony murders, which stood vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-374 (4), (5) (434 SE2d 479) (1993). Wright moved for a new trial on March 2, 2001, which was denied on March 7, 2002. Wright filed a notice of appeal on April 5, 2002. His appeal was docketed in this Court on May 20, 2002, and submitted for decision on July 15, 2002.

Hudson appeared to be consoling Beverly. Hudson and Beverly had recently developed a relationship with one another beyond their connection through Wright. An argument ensued, Wright hit Hudson over the head with a flashlight several times, shot him twice, and then forced Beverly to leave the house with him.

Late in the morning of June 30, 2000 after not being able to reach her mother by telephone, the couple's daughter, Jennifer, drove to her mother's home. She discovered Hudson's body on the floor of the master bedroom. At 11:23 a.m., Jennifer called the police. There were smears of blood in the garage. Hudson had fatal gunshot wounds to his torso fired from a .38 caliber Taurus handgun owned by Beverly, which she kept in the headboard of her bed. By 1:46 p.m., investigators had learned of the marital problems, had determined that the .38 pistol was missing, and had issued bulletins to "be on the lookout" for Wright and Beverly, his car, and Beverly's car; it was stated that Wright should be considered armed and dangerous.

Investigation revealed that Wright planned to go to Florida with a friend named Tyson. At approximately 4:40 p.m. on June 30, 2000, Wright's car was discovered outside Tyson's trailer in neighboring Walker County. Officers arrived, and Tyson informed them that Wright was asleep inside, alone. The police entered the trailer and took Wright into custody in the bedroom. In his car was a .38 caliber revolver that was proved to have been used to kill Hudson. Taken from the bedroom was a duffle bag in which there was a prescription bottle labeled with Hudson's name, the key to Hudson's car, a disposable camera, and clothes belonging to Wright which were wet, muddy, and bloody.

Early in the afternoon of June 30, 2000, it was discovered that a car had gone off Lookout Mountain and was in the trees 75 feet below a cliff edge. No one was inside the car. Recovery efforts began at approximately 8:00 p.m., but were unsuccessful until the next day. The car was determined to be Beverly's and her body was found near it. She had suffered numerous blows to the head with a blunt object; her skull was "bashed in." Some injuries to her torso occurred after her death; her injuries were not consistent with her being alive as the car went over the cliff. The location of the car was near the Wright's marital home in the valley below. The home of Wright's brother, where Wright had been staying since leaving the marital home, was 200 or 300 yards from the marital home.

Wright testified that: Beverly shot Hudson; Wright attempted to flee but Beverly caught him and forced him to the garage floor; she forced Wright at gunpoint to drive to the top of Lookout Mountain; she forcibly committed oral sodomy on him after pinning his hands in the window; they struggled over the pistol; Beverly was struck in the head several times but prevailed in the struggle; at gunpoint, she

forced Wright into the front passenger seat of the car; she got into the driver's seat and attempted to drive the car off the cliff with Wright inside; Wright managed to roll out of the car as it was going over the edge of the cliff, grabbing the pistol as he went; Beverly remained in the car; Wright then walked to his brother's home, where he showered, changed, and put the items he thought might be evidence into a duffle bag and left his brother's home; he did not know whether Hudson or Beverly remained alive; he did not call an ambulance or the police, but did attempt to call his attorney, who was out of town;[2] he drove to Tyson's home and went to sleep. During pre-trial incarceration, Wright wrote a letter to a friend reciting substantially the same version of events.

1. The evidence was sufficient to enable a rational trier of fact to find Wright guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The trial court allowed certain witnesses to testify as to statements made by Beverly before her death under the necessity exception to the hearsay exclusion rule. OCGA § 24-3-1 (b). For such testimony to be admissible, the declarant must be unavailable and the statement must have particularized guarantees of trustworthiness. *Abraha v. State*, 271 Ga. 309, 313 (2) (518 SE2d 894) (1999). "[T]he circumstances '[which demonstrate] the reliability of (hearsay) statements will vary depending on the nature of the statements,' [and therefore,] the determination of trustworthiness is inescapably subjective." *Gissendaner v. State*, 272 Ga. 704, 710-711 (6) (532 SE2d 677) (2000). Whether guarantees of trustworthiness exist is determined by the totality of the circumstances, and the trial court exercises its discretion in resolving the issue. *McCulley v. State*, 273 Ga. 40, 41-42 (2) (a) (537 SE2d 340) (2000). The trial court's determination will not be reversed absent an abuse of its discretion. *Gissendaner*, supra.

It must be noted that Wright has not specified the statements he contends were both improperly admitted and harmful to him, other than those "concerning bad acts or misconduct" on Wright's part, during the separation.[3] Apparently, Wright is alleging reversible error based on the testimony of certain of Beverly's friends and Jennifer Wright. Although Wright contends that the fact that the witnesses

---

[2] Between 9:17 a.m. and 10:46 a.m. on June 30, 2000, Wright drove through a State Patrol driver's license checkpoint on a road between his brother's home and Tyson's. He did not report any information concerning Hudson or Beverly to the trooper who checked his license.

[3] A pretrial hearing was held on Wright's motion to "Make a Determination of Indicia of Reliability," at which the focus was Beverly's relationship to the witnesses called at that hearing. Wright made no objection at trial to any specific testimony.

were Beverly's daughter and Beverly's friends shows bias on their part,[4] the "[u]ncontradicted statements made to one in whom the deceased declarant placed great confidence and to whom she turned for help with her problems are admissible under the necessity exception." *Ward v. State*, 271 Ga. 648, 650 (2) (520 SE2d 205) (1999). Each of the witnesses at issue testified that she had such a relationship with Beverly, that she and Beverly regularly discussed matters concerning Beverly's relationship with Wright, and that nothing Beverly had ever told her had been recanted. All but one testified that she was sufficiently intimate with Beverly to know of Beverly's use of illegal drugs; the other witness was not asked if she knew of that history.

Wright contends that all of these witnesses were not shown to be confidantes of Beverly because the true nature of Beverly's relationship with Hudson was not revealed to them; to most of these witnesses, Beverly stated that she and Hudson were merely friends who went to dinner on occasion, although Jennifer Wright testified that Beverly and Hudson had become close and had begun "dating" in the last two weeks before their deaths, and that she had seen Beverly and Hudson kissing in a romantic manner "less than a week" before their deaths. But, the true nature of the relationship between Beverly and Hudson was not established beyond question, and though there was some evidence that Beverly and Hudson had spent a night in the same house, other evidence showed that Hudson was sexually impotent, a fact Beverly had shared with at least some of the witnesses. Even assuming a romantic relationship, the only evidence showed that it existed for a short period of time immediately preceding the deaths of Hudson and Beverly, and any failure of Beverly's to tell all the challenged witnesses that she and Hudson were romantically involved did not prevent the court, in the exercise of its discretion, from determining that these witnesses were those "in whom the deceased declarant placed great confidence and to whom she turned for help with her problems." Id. Further, the statements Beverly made to these witnesses concerning Wright's conduct were not in any material manner contradicted. Id. And the trustworthiness of the statements is enhanced by the fact that Beverly's statements to the witnesses that concerned Wright's behavior were made at times shortly after that behavior occurred. See *McKissick v. State*, 263 Ga. 188, 189 (3) (429 SE2d 655) (1993) (see *Clark v. State*, 271 Ga. 6, 10 (5) (515 SE2d 155) (1999), stating that *McKissick* was implicitly overruled on other grounds in *Chapel v. State*, 270 Ga. 151, 155 (4) (510 SE2d 802) (1998)).

---

[4] This argument ignores the fact that Beverly's daughter is also Wright's daughter.

The trial court also admitted into evidence under the necessity exception a series of notes that Beverly made concerning Wright's conduct subsequent to his filing for divorce. Wright contends that the notes were made in contemplation of the divorce litigation and are inherently untrustworthy, but there was testimony that Beverly made the notes because if "something happened to her, she wanted it on paper." Further, there is no bright-line rule barring statements made to one's attorney in a divorce action under the necessity exception. *Dix v. State*, 267 Ga. 429, 431 (2) (479 SE2d 739) (1997). And we see no reason to impose one where the declarations are made in writing by one who is a party to a divorce action, with the anticipation that the declarations may prove useful in that action. Most of the statements in the notes were corroborated by other evidence. See *Perkins v. State*, 269 Ga. 791, 795-796 (4) (505 SE2d 16) (1998). Further, even if the notes were inadmissible, their introduction was harmless. At the pretrial hearing, Wright withdrew any objection to the introduction of hearsay evidence concerning the incident at the Villager Motel.[5] Finally, the note to the effect that, on the afternoon of June 29, Wright threatened that he would kill Beverly if she brought another man into the marital residence was duplicative of other evidence.

3. Wright also complains that evidence about his use of illegal drugs was wrongly admitted. "Evidence which is relevant to an issue in a case is not rendered inadmissible by the fact that it incidentally puts the defendant's character in issue. [Cit.]" *Johnson v. State*, 260 Ga. 457, 458 (2) (396 SE2d 888) (1990). Evidence showed that one reason underlying Beverly's resolve not to reconcile with Wright was Wright's drug use, and the State's theory of the case was that one of Wright's motives in killing Beverly was his displeasure and frustration over her decision to end their marriage. See *Ware v. State*, 273 Ga. 16, 17 (2) (537 SE2d 657) (2000); *Hall v. State*, 264 Ga. 85, 86 (2) (441 SE2d 245) (1994). Although Wright attempted to refute the State's theory of the case and show that he did not have the motive ascribed to him, that does not render the evidence irrelevant.

4. When Wright was arrested, a duffle bag was on the floor of the bedroom in which the arrest took place. The officers asked a resident of the trailer if Wright had any belongings there, and were told that the duffle bag was his; the officers removed the duffle bag and took it

---

[5] This withdrawal apparently included any objection concerning Wright's following Beverly from the motel in his car, forcing her off the road, threatening to break the window of Beverly's car, and taking a camera from Beverly's car. No argument was made concerning this incident, and Wright conceded "the Villager motel" had sufficient indicia of reliability, an apparent reference to the audiotape of Beverly's roadside call by cellular telephone to 911, and her recounting of the incident upon arriving at her workplace immediately afterward.

with them. Wright urges that this was an invalid seizure, arguing that the officers did not have authority to arrest him without a warrant and no authority to take the bag as incident to such an arrest.

First, the warrantless arrest of Wright was authorized under OCGA § 17-4-20 (a); the police had probable cause to believe that an act of family violence had been committed. Hudson's body had been found in Wright's house, and Beverly was missing. By the time of the arrest, police knew that: Wright and Beverly were estranged; Wright had stalked and threatened Beverly; Beverly had told Wright the day before the arrest that she wished to complete the divorce; the night before, Wright had stated his intention to visit Hudson; Wright planned to leave the state with Tyson; and Wright was in Tyson's home, allegedly asleep. Tyson told the police that Wright was alone in the home, but they had no independent knowledge of this, and Beverly remained missing. There is no error in the trial court's conclusion that Wright's warrantless arrest was justified under OCGA § 17-4-20 (a), as the police had probable cause to believe that an act of family violence had occurred. Beverly's body had not yet been found, and the possibility that she was still alive was an exigent circumstance authorizing the entry into Tyson's home to arrest Wright. Compare *State v. Peterson*, 273 Ga. 657, 660 (543 SE2d 692) (2001).

Under OCGA § 17-5-1 (a) (4),

When a lawful arrest is effected a peace officer may reasonably search the person arrested and the area within the person's immediate presence for the purpose of: . . . (4) Discovering or seizing any instruments, articles, or things which are being used or which may have been used in the commission of the crime for which the person has been arrested.

Wright was on the bed and the duffle bag was on the floor of the bedroom. It was in his "immediate presence" within the meaning of OCGA § 17-5-1 (4), and reasonably could be seized and searched for items used in the commission of the crime.

5. At the time of Wright's arrest, Walker County deputies impounded his car. It was taken to the Rossville Police Station where an inventory of its contents was made, and the weapon used to kill Hudson was first discovered. The car was later searched pursuant to a warrant. Wright contends that the trial court should have suppressed the warrantless search and seizure of the car.

"The contents of an impounded vehicle are routinely inventoried to protect the property of the owner, protect the officers against claims for lost or stolen property, and protect the police from potential danger." *Goodman v. State*, 255 Ga. 226, 229 (13) (336 SE2d 757) (1985). The testimony was that the officers involved conducted inven-

tory searches as a matter of procedure for just such reasons. Nonetheless, Wright argues that the officers had no authority to impound the vehicle, as it was parked at a private residence and was of no hindrance to traffic.

"It is well established that a police seizure and inventory is not dependent for its validity upon the absolute necessity for the police to take charge of property to preserve it. They are permitted to take charge of property under broader circumstances than that." *Mooney v. State,* 243 Ga. 373, 375 (1) (254 SE2d 337) (1979). Here the car was parked, but at the home of a friend of Wright's, with whom Wright had planned to leave the state. The officers were not required to trust that the car would be untouched if left at the scene. *"[T]he ultimate test for the validity of the police's conduct is whether, under the circumstances then confronting the police, their conduct was reasonable within the meaning of the Fourth Amendment."* (Emphasis in original.) *Jones v. State,* 187 Ga. App. 421, 424 (370 SE2d 784) (1988).

> "[A] crucial fact is that the officers had every reason to expect that the detention of [Wright] would last [for some time]. Given that fact, it was reasonable for the officers to take the car whenever it was most convenient for them to do so; and presumably it was most convenient immediately following the arrest, when they were at the [trailer] with the car keys."

*Mooney,* supra at 379, citing with approval *United States v. Gravitt,* 484 F2d 375, 380 n. 5 (5th Cir. 1973), cert. den. 414 U. S. 1135 (94 SC 879, 38 LE2d 761) (1974). The Walker County officers had been specifically told to be on the lookout for this vehicle, and knew that it was wanted in an investigation in another county. Under these circumstances, it was not unreasonable to immediately impound, transfer, and inventory the car. Id.

This case is not controlled by *State v. Lejeune,* 276 Ga. 179 (576 SE2d 888) (2003), in which there was no evidence that the search was a valid inventory search, or a lawful search pursuant to arrest.[6] Id. at 182 (2). The officers here were faced with a different set of circumstances than faced by those in *Lejeune.* There the vehicle was parked at Lejeune's residence, and the police had in custody both Lejeune and his roommate.[7] Here, the vehicle was not at Wright's residence, and those who might tamper with it were not in custody. Rather the car was at the residence of Tyson, Wright's friend who, but for the arrest of Wright, would have accompanied Wright on his

---

[6] The officers in *Lejeune* proceeded under a warrant that later proved to be invalid.
[7] What the *Lejeune* opinion refers to as "the suspect and his only alleged cohort."

trip out of the state. Consequently, the police were justified in removing the vehicle. While impounding the car may have been unreasonable in *Lejeune*, it was reasonable here.

6. Finally, Wright contends that the trial court should have suppressed the photographs developed from the film in the disposable camera found in his duffle bag. The court specifically found that Wright lacked standing to raise this challenge as it was his brother's camera. See *Burgeson v. State*, 267 Ga. 102, 105 (3) (b) (475 SE2d 580) (1996); *State v. Harris*, 236 Ga. App. 525, 529 (3) (513 SE2d 1) (1999). The only evidence was that the camera belonged to Wright's brother and had been lent to Wright. Of the 20 photographs developed, 19 were taken by Wright's brother. Wright not only had no proprietary interest in the camera, but could have no reasonable expectation of privacy in film in a disposable camera that had been borrowed from another, and which would have to be returned to the owner upon demand. In this regard, the disposable camera differs from a borrowed automobile. Compare *Hall v. State*, 223 Ga. App. 211 (1) (477 SE2d 364) (1996). The automobile can be returned to its owner in the same condition as it was when borrowed, after the removal of any private possessions therein, while the camera cannot; the film must remain in it until all photographs are developed.

Further, the photographs were admissible under the same rationale as that authorizing an inventory search; the police must be able to protect themselves "against claims for lost or stolen property." *Goodman*, supra. Approximately a week after the killings, Hudson's family asked for the return of his property. The camera was found in the duffle bag with a prescription bottle bearing his name and the keys to Hudson's car. The film was developed in a reasonable effort to determine the proper owner of the camera and the photographs inside. See *Waine v. State*, 377 A2d 509, 517 (Md. Ct. Spec. App. 1977).

Additionally, "the film was the fruit of a search incident to the arrest, the arrest was made with probable cause and therefore the search of the [duffle bag found in Wright's immediate presence], including any containers therein, was legal." *Gosdin v. State*, 176 Ga. App. 381, 383 (1) (336 SE2d 261) (1985). Development of the film was simply an examination of the camera (i.e., container) found incident to the arrest, and is akin to a laboratory test on any lawfully seized object. See *State v. Riedel*, 656 NW2d 789, 793 (Wis. Ct. App. 2002).

In any event, the admission into evidence of the final photograph in the camera, if error, was harmless. The photograph, and the logical inferences drawn therefrom, show that Wright was in the bedroom, in the company of the victims, before their deaths. That information was already before the jury by other means, and would have been introduced regardless of whether the motion to suppress the

photograph was granted. In a letter Wright wrote to a friend a few days after his arrest, he related that he came into the bedroom and found Beverly and Hudson, although he did not mention a camera or the photograph in the letter.[8] Despite Wright's request in the letter that the recipient destroy it, she did not do so. At the time Wright wrote the letter, the film had not been developed, and the letter is in no sense a product of the police's act of developing the film, nor was its introduction dependent upon the development of the film. See *Duncan v. State*, 259 Ga. 278, 282 (2) (379 SE2d 507) (1989). As separate evidence showed that Wright was in the bedroom when Hudson was shot, the introduction of the photograph was, if error, harmless. *Satterfield v. State*, 256 Ga. 593, 597 (4) (351 SE2d 625) (1987).

*Judgments affirmed. All the Justices concur, except Fletcher, C. J., Sears, P. J., and Carley, J., who dissent.*

FLETCHER, Chief Justice, dissenting.

I dissent because the trial court erred in admitting the hearsay statements of Beverly Wright and denying the defendant's motion to suppress.

In *Yancey v. State*,[9] we reiterated that the party presenting hearsay evidence under the necessity exception must prove that the person who made the out-of-court statement is unavailable to testify at trial, the statement is relevant to a material fact, the statement is more probative on that fact than other available evidence, and the statement shows particular guarantees of trustworthiness. Here, Beverly Wright's out-of-court statements to co-workers Mahalah Smith, Susie McSpadden, and Regina Whitlow were inadmissible since other more probative evidence was introduced at trial about the defendant's drug use, the couple's marital problems, the extramarital affair between the two victims, and the incident when the defendant ran his wife off the road. Mrs. Wright's statements to Rebecca Parker, whom she had known just a year, should not have been admitted because they lacked trustworthiness. Finally, as Justice Sears points out, Mrs. Wright's journal entries about her husband's conduct after he filed for divorce were written to support her position in the divorce action and, therefore, were not made under circumstances demonstrating particular guarantees of trustworthiness.[10]

I also join Justice Carley's dissent because the warrantless search of Wright's automobile violated his Fourth Amendment right

---

[8] At trial, Wright testified that he had a camera and took the photograph.

[9] 275 Ga. 550 (570 SE2d 269) (2002).

[10] See *Slakman v. State*, 272 Ga. 662 (533 SE2d 383) (1999); *Dix v. State*, 267 Ga. 429 (479 SE2d 739) (1997).

against unreasonable searches and seizures.[11]

I am authorized to state that Presiding Justice Sears joins in this dissent.

SEARS, Presiding Justice, dissenting.

For the reasons explained in Justice Carley's dissenting opinion, I respectfully dissent to the majority's affirmance of this appeal. I write separately, however, to note that the majority's analysis in Division 2 regarding the trial court's decision to admit the victim's personal journal entries regarding her upcoming divorce litigation is in conflict with this Court's precedent governing the admissibility of out-of-court statements under the necessity exception to the rule against hearsay. First, the majority improperly treats other evidence corroborating the journal's contents as indicators of the journal's reliability.[12] This Court has recently held that evidence corroborating out-of-court statements does not indicate reliability but rather is considered only when determining whether any error in admitting the statements was harmless.[13]

Moreover, there is nothing inherent in the nature of statements made in anticipation of or preparation for divorce litigation that suggests they will necessarily be truthful.[14] Spouses who, as here, face the likelihood of divorce may often be inclined to make self-serving statements that tend to portray the marital relationship in an inaccurate or biased light.[15] Considering the totality of the circumstances in this case, I can discern no strong indicators of reliability that militated in favor of the journal entries' admission into evidence. To the contrary, it appears that the hearsay declarant was under great stress due to her relationship and also was using illicit drugs. There being no real indicia of reliability associated with the journal entries, I believe that the trial court erred in admitting them under the necessity exception.

I am authorized to state that Chief Justice Fletcher joins in this dissent.

CARLEY, Justice, dissenting.

I dissent to Division 5 of the majority opinion and to the judgment of affirmance. In my opinion, *State v. Lejeune*, 276 Ga. 179, 182 (2) (576 SE2d 888) (2003) is not distinguishable. In both *Lejeune* and the instant case, there was no justification for the impoundment of

---

[11] See *State v. Lejeune*, 276 Ga. 179 (576 SE2d 888) (2003).
[12] Op. at 458.
[13] *Yancey v. State*, 275 Ga. 550, 555 (570 SE2d 269) (2002).
[14] *Dix v. State*, 267 Ga. 429, 431 (479 SE2d 739) (1997).
[15] Id.

the defendant's vehicle.

The majority correctly avoids justifying the seizure under the automobile exception or as incident to the arrest. See *State v. Lejeune*, supra. In the absence of an exception to the warrant requirement, police officers are not authorized to conduct a warrantless investigatory search under the guise of an inventory search. *Williams v. State*, 157 Ga. App. 476, 480 (3) (277 SE2d 923) (1981); *Gaston v. State*, 155 Ga. App. 337, 339 (270 SE2d 877) (1980). See also *State v. Evans*, 181 Ga. App. 422, 423 (2) (352 SE2d 599) (1986). "[T]he police may not make a pretextual inventory search of an arrestee's automobile in violation of his constitutionally-protected privacy rights. [Cits.]" *Fortson v. State*, 262 Ga. 3, 4 (1) (412 SE2d 833) (1992).

"The state may inventory the contents of a car that has been *lawfully* impounded." (Emphasis supplied.) *Sams v. State*, 265 Ga. 534, 535 (3) (459 SE2d 551) (1995). "Justification of an inventory search is thus premised upon the validity of the impoundment. [Cit.]" *State v. Lowe*, 224 Ga. App. 228, 229 (480 SE2d 611) (1997). The police may not use an impoundment as a medium to search for contraband or other evidence of a crime. *State v. Lowe*, supra at 229.

> Even though the decision to seize and inventory need not be based upon the "absolute necessity" to do so, unless the rationale for an inventory search inheres in the decision to seize and inventory, the impoundment itself may be "unreasonable" and the resulting inventory search invalid. [Cit.]

*State v. Thomason*, 153 Ga. App. 345, 349 (3) (265 SE2d 312) (1980).

In both this case and *Lejeune*, "the officer[s] had no authority to impound the [vehicle] because [it] was legally parked and not creating a traffic hazard. [Cit.]" *Sams v. State*, supra at 535-536 (3). Furthermore, neither Wright nor the majority has presented any other non-investigatory justification for the impoundment of his car. The vehicle was not stopped by police on a highway, but was parked at the residential property of a friend, and there is no evidence that the car was connected to the arrest of Wright, that his ownership was in doubt, that he was consulted regarding alternate disposition of the vehicle, that it had an invalid tag, or that his friend requested its removal. *Mitchell v. State*, 178 Ga. App. 244, 245-246 (3) (342 SE2d 738) (1986); *Strobhert v. State*, 165 Ga. App. 515, 516 (301 SE2d 681) (1983); *State v. Darabaris*, 159 Ga. App. 121 (282 SE2d 744) (1981). See also 2 LaFave, Israel & King, Criminal Procedure § 3.7 (d), p. 214 (2nd ed. 1999). Compare *State v. Lowe*, supra at 230-231.

The fact that the detention of Wright was expected to last for some time was not a valid reason for impoundment, because there was no evidence that the car was parked at a business or other loca-

tion where it would not be allowed to remain for more than a short time. See *State v. Lowe*, supra at 231; *Fitzgerald v. State*, 201 Ga. App. 361, 364 (3) (411 SE2d 102) (1991). Compare *Mooney v. State*, 243 Ga. 373, 379 (1) (254 SE2d 337) (1979); *United States v. Gravitt*, 484 F2d 375, 380, fn. 5 (5th Cir. 1973). Nor can the impoundment be justified by the possibility that Wright's friend may tamper with evidence in the car. Such a motive is clearly investigatory in nature. Thus, contrary to the assertion of the majority, *Lejeune* is not distinguishable on this basis. The appropriate action of the investigating officers, if they believed that they had probable cause to search Wright's car, would have been to accept the offer of Walker County deputies to secure the vehicle until a search warrant was obtained. Where law enforcement officers conduct a warrantless investigatory search under the guise of an inventory search, "we should 'refuse to allow such apparent subterfuges to erode the strictures of the fourth amendment.' [Cit.]" *Williams v. State*, supra at 480.

"In short, there was no showing that the impoundment of the car was reasonably necessary. [Cits.]" *Mitchell v. State*, supra at 246 (3). The trial court should have granted the motion to suppress the evidence obtained as a result of the warrantless seizure and search of the automobile, and the majority incorrectly affirms the denial of that motion.

I am authorized to state that Chief Justice Fletcher and Presiding Justice Sears join in this dissent.

DECIDED MARCH 27, 2003 —
RECONSIDERATION DENIED APRIL 11, 2003.

*Christopher A. Townley*, for appellant.

*Herbert E. Franklin, Jr., District Attorney, Thurbert E. Baker, Attorney General, Ruth M. Pawlak, Assistant Attorney General*, for appellee.