[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10797
Non-Argument Calendar
_____

D.C. Docket No. 1:15-cv-00523-TWT


KELLY RENEE GISSENDANER,

Plaintiff-Appellant,

versus

COMMISSIONER, GEORGIA DEPARTMENT OF CORRECTIONS,
WARDEN, GEORGIA DIAGNOSTIC AND CLASSIFICATION PRISON,
OTHER UNKNOWN EMPLOYEES AND AGENTS,
Georgia Department of Corrections,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(March 2, 2015)

Before ED CARNES, Chief Judge, TJOFLAT and JORDAN, Circuit Judges.

PER CURIAM:

Kelly Gissendaner masterminded the brutal murder of her husband, Douglas, by her paramour, Gregory Owen.  See Gissendaner v. State, 532 S.E.2d 677, 681–83 (Ga. 2000).  Facing impending execution by lethal injection, Gissendaner has filed a 42 U.S.C. § 1983 lawsuit alleging that the State of Georgia's method of execution violates the Eighth Amendment's prohibition on cruel and unusual punishment.  After holding a hearing, the district court denied Gissendaner's request for a temporary restraining order and dismissed her complaint for failing to state a claim for relief.  This is her appeal.[1]

## I.    BACKGROUND

The Superior Court of Gwinnett County issued an order on February 9, 2015, directing the Georgia Department of Corrections to execute Gissendaner.  Her execution is scheduled for March 2, 2015.  The week after the order was issued, Gissendaner filed a 42 U.S.C. § 1983 lawsuit challenging the constitutionality of Georgia's lethal injection protocol.

The latest iteration of Georgia's written protocol for lethal injections, which was adopted on July 17, 2012, establishes a detailed procedure for executing a condemned prisoner.[2]  The individuals involved in the execution procedure include

---

[1] Gissendaner's unsuccessful challenges to set aside her conviction and death sentence are set out in Gissendaner v. Seaboldt, 735 F.3d 1311 (11th Cir. 2013); Gissendaner v. State, 532 S.E.2d 677 (Ga. 2000); and Gissendaner v. State, 500 S.E.2d 577 (Ga. 1998).

[2] We omit many of those details because they are not relevant to the issues raised in this appeal.

2

an "IV Team" to establish access to one of the prisoner's veins, a physician to provide medical assistance during the process, and an "Injection Team" to deliver the drugs. The IV Team must include at least two trained personnel, one of whom must be an IV nurse, and the Injection Team must include three prison staff members trained to deliver the injections. The protocol calls for the IV Team to initially attempt to provide two "intravenous accesses" for the injection.[3] If the IV nurse is unable to identify a suitable vein in the prisoner's legs or arms, the physician on hand "will provide access by central venous cannulation or other medically approved alternative."[4]

Once access to a vein is established, the members of the Injection Team then administer a series of three injections, one delivered by each team member. The sequence consists of: (1) an initial 2.5 gram dose of pentobarbital, (2) a second 2.5 gram dose of pentobarbital, and (3) 60 cubic centimeters of saline to flush the IV line. Regarding the drug used in the first two injections, the protocol specifies only that it be "pentobarbital." "If, after a sufficient time for death to have occurred," the prisoner "exhibits visible signs of life," the protocol calls for another five

---

[3] Intravenous access means entry to a vein and is typically established with a needle. See Nelson v. Campbell, 541 U.S. 637, 640, 124 S. Ct. 2117, 2121 (2004).

[4] Central venous cannulation is a technique for gaining access to one of the major veins in an individual's body, such as the jugular or femoral veins. See generally Jane M. Lavelle & Andrew T. Costarino, Central Venous Cannulation, in Textbook of Pediatric Emergency Procedures 247, 247 (Christopher King & Fred M. Henretig eds., 2d ed. 2008)

grams of pentobarbital to be administered using the same procedure.  And if the prisoner "shows residual signs of life within a reasonable period" of receiving that second round of injections, the protocol calls for five more grams of pentobarbital using the same procedure.

In carrying out its written protocol, Georgia has refused to reveal the source of its pentobarbital or the identities and qualifications of the individuals who will participate in the execution process.  The State has refused to do so based on what is called its "lethal injection secrecy act," which was enacted in March 2013 and took effect that July.  See Ga. Code Ann. § 42-5-36(d).  The act extends "confidential state secret" status to the "identifying information" of the individuals and entities who are involved in carrying out an execution or supplying the drugs and other materials used in an execution.  See id.  It provides that such identifying information "shall be confidential and shall not be subject to disclosure under [a state public records request] or under judicial process."  Id.

Gissendaner's § 1983 complaint contains a series of allegations about Georgia's lethal injection protocol and the State's refusal to reveal certain details about its execution process.  Her principal claim regarding the protocol is that Georgia's switch in March 2013 from using FDA-approved pentobarbital to compounded pentobarbital creates a substantial risk that the drugs used in her

4

execution will cause her to suffer unnecessary and excruciating pain.[5]  She alleges that the pharmacies that produce compounded pentobarbital are subject to the laxer monitoring by, and lower standards of, state pharmacy boards, with a resulting risk that the drugs they produce will lack the "identity, potency, and purity" that is ensured by FDA monitoring.  She supports her allegations with two sets of documents.  The first is an affidavit from Dr. Larry Sasich that describes the general risks of using compounded pentobarbital.  The second is a series of news stories about three recent executions using compounded pentobarbital — Michael Lee Wilson in Oklahoma, Jose Luis Villegas in Texas, and Eric Robert in South Dakota.

Gissendaner also contends that Georgia obtained its supply of compounded pentobarbital in violation of both state and federal law.  She neither proffers nor cites any evidence to support this claim.  Instead, she argues that Georgia could not possibly have acquired its compounded pentobarbital without violating state and federal laws and regulations.  For example, she argues that, because the execution of a prisoner is not a legitimate medical purpose, Georgia has violated the Controlled Substances Act's requirements that Schedule II drugs such as pentobarbital be dispensed only for a "medical purpose," 21 U.S.C. § 829(c), and

---

[5] The terms "FDA-approved pentobarbital" and "compounded pentobarbital" come from the complaint.  The difference between the two, according to the allegations of the complaint, is that the former is manufactured by a company that is subject to FDA monitoring and standards, while the latter is produced by a compounding pharmacy that is subject only to state monitoring and standards.

5

pursuant to a "valid prescription" that was "issued for a legitimate medical purpose," id. § 830(b)(3)(A)(ii).

In addition to Gissendaner's claims based on compounded pentobarbital, she also contends that Georgia's protocol does not ensure that the IV Team is qualified to establish reliable intravenous access for a prisoner like her — one who is female, obese, and at risk for obstructive sleep apnea. She bases that contention on two sets of documents. The first is a series of newspaper stories describing the executions (and one attempted execution) of three male prisoners in three other states: Clayton Lockett in Oklahoma, Angel Diaz in Florida, and Romell Broom in Ohio. According to those news stories, there were complications in all three instances because of the difficulty of establishing reliable intravenous access for the prisoners. The second document is an affidavit from Dr. Joel Zivot, which states his opinion that establishing reliable intravenous access will be especially difficult in Gissendaner's case because she is female and obese. It also states his opinion that Gissendaner's obesity puts her at risk for sleep apnea, which can contribute to choking and gasping during an execution.

Gissendaner also claims that Georgia had aggressively interpreted and applied its lethal injection secrecy act to prevent her from obtaining the details she needs to make an Eighth Amendment challenge to the State's protocol. She

6

argues, among other things, that the use of the act is grounds to deny Georgia officials the presumption of good faith usually afforded to state officials.

In addition to her allegations about Georgia's lethal injection protocol, Gissendaner seeks a stay of her execution based on the Supreme Court's grant of certiorari in Glossip v. Gross, No. 14-7955, 574 U.S. —, reported sub nom. Warner v. Gross, 2015 WL 302647, at *1 (Jan. 23, 2015).  She argues that the grant of certiorari is a sign the Court will be reshaping its standard for Eighth Amendment challenges to lethal injection protocols, and that her execution should be stayed so that she can challenge Georgia's protocol under the Court's new standard, whatever it turns out to be.

Georgia filed a motion to dismiss the complaint and deny Gissendaner's motion for a temporary restraining order.  After holding a hearing on the motions, the district court issued a written order reasoning that our decision in Wellons v. Commissioner, Georgia Department of Corrections, 754 F.3d 1260, 1265 (11th Cir. 2014), forecloses Gissendaner's claims because her allegations and evidence are so similar to those we rejected in Wellons.  The district court concluded that Gissendaner has not demonstrated a substantial likelihood of success on the merits or stated a claim for relief under the standard established by the Supreme Court in Baze v. Rees, 553 U.S. 35, 50–52 128 S. Ct. 1520, 1531–32 (2008) (plurality

7

opinion).  It denied Gissendaner's motion for a temporary restraining order,

granted the State's motion to dismiss, and entered judgment dismissing the action.

Gissendaner then filed in this Court a timely appeal challenging the district

court's judgment, and a motion seeking a stay of execution.

## II.    DISCUSSION

The standard for granting a temporary restraining order or a stay of

execution is the same.  Either action is appropriate only if the moving party

establishes all of the following four elements:

> (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest.

Wellons, 754 F.3d at 1263 (quoting Chavez v. Fla. SP Warden, 742 F.3d 1267,

1271 (11th Cir. 2014)).  We review the district court's denial of a motion for a

temporary restraining order only for an abuse of discretion.  DeYoung v. Owens,

646 F.3d 1319, 1324 n.2 (11th Cir. 2011).  We review de novo the grant of a

motion to dismiss, accepting the complaint's allegations as true and construing

them in the light most favorable to the plaintiff.  Powell v. Thomas, 643 F.3d 1300,

1302 (11th Cir. 2011).

8

**A.**

The State contends that Gissendaner's § 1983 complaint is time-barred, and that the district court therefore did not abuse its discretion in denying her motion for a temporary restraining order or stay.  If a complaint is untimely, it will not succeed on the merits.  Crowe v. Donald, 528 F.3d 1290, 1293 (11th Cir. 2008).  Though the district court's order did not address the statute of limitations when Georgia raised it as a ground for denying Gissendaner's motion, we may consider it as a basis for affirming that court's judgment.  See Wellons, 754 F.3d at 1263; see also Crowe, 528 F.3d at 1292 (relying on the statute of limitations, instead of the district court's actual grounds, because an appellate court may "affirm on any ground supported by the record") (quotation marks omitted).

Like other actions brought under § 1983, a challenge to a state's method of execution is subject to the statute of limitations governing personal injury actions in the state where the challenge was brought.  McNair v. Allen, 515 F.3d 1168, 1173 (11th Cir. 2008).  Gissendaner brought her claim in Georgia, which has a two-year statute of limitations period.  Crowe, 528 F.3d at 1292 (citing Ga. Code Ann. § 9-3-33).  A claim challenging the state's method of execution "accrues on the later of the date on which" direct review is completed by denial of certiorari, "or the date on which the capital litigant becomes subject to a new or substantially

9

changed execution protocol." McNair, 515 F.3d at 1174.[6]  Of course, a claim that accrues by virtue of a substantial change in a state's execution protocol is limited to the particular part of the protocol that changed.  See Henyard v. Sec'y, DOC, 543 F.3d 644, 647–48 (11th Cir. 2008).  In other words, a substantial change to one aspect of a state's execution protocol does not allow a prisoner whose complaint would otherwise be time-barred to make a "wholesale challenge" to the State's protocol.  See id. at 647.

Gissendaner's state review became final in April 2001, see Gissendaner v. Georgia, 531 U.S. 1196, 121 S. Ct. 1201 (2001), and Georgia adopted lethal injection as its method of execution in October 2001, see Wellons, 754 F.3d at 1264.  So unless Gissendaner's complaint alleges facts or presents evidence showing that Georgia's lethal injection procedure has "substantially changed" in the twenty-four months before she filed her complaint on February 20, 2015, her challenge is time-barred.  See Wellons, 754 F.3d at 1263–64; see also Mann v. Palmer, 713 F.3d 1306, 1313–14 (11th Cir. 2013) (stating that factual allegations and evidence attached to the complaint may establish a "substantial change" in an execution protocol).

---

[6] The McNair opinion refers to "the date on which state review is complete," and that occurred on October 1, 1990, 515 F.3d at 1173–74, which is the date that the Supreme Court denied certiorari review on direct appeal, id. at 1171.

Several of Gissendaner's claims are untimely because they rely on factual conditions that have not changed in the past twenty-four months. For example, she claims that Georgia does not have adequate training and procedures to establish intravenous access, but she does not identify any change in the past twenty-four months that Georgia has made either to the prescribed method for establishing intravenous access or to the requisite qualifications of the individuals on the IV Team.[7]

The affidavit from Dr. Zivot relies on the July 17, 2012, written protocol, which had been in place for more than two years before the complaint was filed. And the news stories regarding recent executions in other states do not establish a change in Georgia's protocol because they are not "evidence of how pentobarbital is actually administered in [Georgia]." Arthur v. Thomas, 674 F.3d 1257, 1262 (11th Cir. 2012). Similarly, Gissendaner claims that the fact that Georgia's written protocol does not make any specific provisions for the proper storage of the execution drugs creates a risk that the drugs will expire before they are used. But that claim is based on Dr. Sasich's reading of Georgia's written protocol, not on any facts about Georgia's recent storage practice or any of the recent executions it

---

[7] The risk factors that Gissendaner claims are particular to her execution do not affect the statute of limitations analysis. She has always been female, and her complaint contains no factual allegations suggesting that her obesity or her potential sleep apnea (the chance of which is increased by her obesity) are recent developments.

11

has carried out, and the written protocol has been in place since July 17, 2012 — more than two years before her complaint was filed.

There are two claims in Gissendaner's complaint that are based on changes to Georgia's lethal injection protocol that occurred in the twenty-four months before she filed her complaint on February 20, 2015. The first is her claim based on Georgia's March 2013 change from using FDA-approved pentobarbital to using compounded pentobarbital. The second is her claim based on Georgia's lethal injection secrecy act, which went into effect in July 2013. See Ga. Code Ann. § 42-5-36(d).

Any argument that these are "substantial changes" is squarely foreclosed by this Court's decision in Wellons, 754 F.3d at 1263–64. In that case, Georgia inmate Marcus Wellons also contended that the State had substantially changed its lethal injection protocol by "changing from pentobarbital to a compound pentobarbital" and by enacting its "lethal injection secrecy act." Id. at 1264. We held that (1) "the Georgia Department of Corrections' anticipated use of an adulterated pentobarbital does not establish a significant alteration in the method of execution"; and (2) the complaint had not "alleged facts sufficient to show that Georgia's legal [sic] injection procedure has 'substantially changed' based on the lethal injection secrecy act adopted by the Georgia legislature." Id. (quotation marks omitted). Those holdings make good sense. The switch from FDA-

12

approved pentobarbital to compounded pentobarbital is not a substantial change because the switch between two forms of the same drug does not significantly alter the method of execution. See id. As for the lethal injection secrecy act, it is not a change to the protocol itself. The act merely alters how the State responds to requests for information about executions, which is different from how it carries out the protocol.

In any event, Wellons is prior panel precedent that binds us unless Gissendaner presents facts that are materially different from those presented in Wellons. See Mann, 713 F.3d at 1313–14.[8] She has not done that. Indeed, the affidavit from Dr. Sasich that Gissendaner attaches to her complaint is almost identical to the affidavit from Dr. Sasich that Wellons attached to his complaint.[9]

---

[8] Gissendaner quotes language from our decision in Arthur v. Thomas to argue that we cannot hold that her complaint is untimely unless she is first given an opportunity to seek discovery in support of her allegations that Georgia has substantially altered its lethal injection protocol. See 674 F.3d at 1262 ("[T]he district court committed reversible error in dismissing Arthur's Eighth Amendment claim without any opportunity for factual development, including discovery between the parties."). Arthur does not, however, stand for such a broad proposition. As we clarified in Mann, a court may dismiss a complaint as untimely — without an evidentiary hearing or discovery — if the allegations and evidence presented are "materially the same" as those presented in a previous case in which the denial of relief was affirmed. 713 F.3d at 1313–14.

[9] The one difference is that the affidavit attached to Gissendaner's complaint includes Dr. Sasich's opinion that there is a risk that the drug used in Gissendaner's execution may degrade before her execution date because Georgia's written protocol does not contain any express provisions for storing the pentobarbital used in executions. As we have already explained, that portion of the Sasich affidavit relies on facts that have been in place for more than two years, which means any claim based on it is untimely.

13

That leaves Gissendaner's claim that Georgia has acquired its compounded pentobarbital in violation of federal and state laws. Our decision in Wellons dictates that this claim is time-barred as well. Wellons held that, given the similarity in the drugs, the switch from FDA-approved pentobarbital to compounded pentobarbital was not a substantial change for purposes of the statute of limitations. See 754 F.3d at 1264. Gissendaner's allegations regarding the legality of Georgia's procurement of compounded pentobarbital are just additional arguments about why the shift from one form of pentobarbital to another is a substantial change. Wellons already held that it was not a substantial change, and the new arguments that Gissendaner raises do not make that decision any less binding. See  Mann, 713 F.3d at 1313 ("[T]he mere act of proffering additional reasons not expressly considered previously will not open the door to reconsideration of the [statute of limitations] question by a second panel.") (second alteration in original) (quoting Valle v. Singer, 655 F.3d 1223, 1231 (11th Cir. 2011)).

All of the claims in Gissendaner's complaint are untimely, so the district court did not abuse its discretion in denying her motion for a temporary restraining order.

14

**B.**

Alternatively, even if her claims were not barred by the statute of limitations, Gissendaner would be due no relief because her complaint fails to state a plausible claim for relief.[10]  To succeed in an Eighth Amendment challenge to a lethal injection protocol, a prisoner "must establish 'an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment.'"  Chavez, 742 F.3d at 1272 (quoting Baze, 553 U.S. at 50, 128 S. Ct. at 1531 (plurality opinion)).  That requires the prisoner to show two things:  "(1) the lethal injection protocol in question creates 'a substantial risk of serious harm,' and (2) there are 'known and available alternatives' that are 'feasible, readily implemented,' and that will 'in fact significantly reduce [the] substantial risk of severe pain.'"  Id. (quoting Baze, 553 U.S. at 50, 52, 61, 128 S. Ct. at 1531–32, 1537) (alteration in Chavez).

As for the first requirement, Gissendaner's allegations and supporting documents — even when viewed in the light most favorable to her — do not establish the requisite level of risk.  As Wellons makes clear, "where an Eighth Amendment cruel and unusual punishment claim alleges the risk of future harm, 'the conditions presenting the risk must be sure or very likely to cause serious

---

[10]  In dismissing Gissendaner's complaint, the district court also denied her a stay of execution based on the Supreme Court's decision to grant certiorari in Glossip, 2015 WL 302647.  It did not abuse its discretion in doing so.  See infra Section II.C.

15

illness and needless suffering, and give rise to sufficiently <u>imminent</u> dangers.'" 754 F.3d at 1265 (quoting <u>Baze</u>, 553 U.S. at 50, 128 S. Ct. at 1531) (quotation marks omitted). None of Gissendaner's factual allegations or evidence present facts that establish a high level of likelihood that she will suffer serious illness or needless suffering during her execution.

As for the second showing, Gissendaner does not even attempt "to show that any . . . alternative procedure or drug is feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." <u>Id.</u> at 1266 (alterations in original) (quotation marks omitted). The allegations of the complaint are totally bereft of: (1) an alternative drug that would substantially reduce the risks she identifies with compounded pentobarbital; (2) an alternative means of procuring that alternative drug; or (3) an alternative method of establishing intravenous access that would substantially reduce the risks she identifies based on her gender, obesity, and possible sleep apnea. As a result, the claims based on those aspects of Georgia's protocol are fatally flawed — as is the claim based on the lethal injection secrecy act. In an Eighth Amendment challenge, the source of the drug and the qualifications of the officials administering it are not relevant "[w]ithout a plausible allegation of a feasible and more humane alternative." <u>Id.</u> at 1265 (quoting <u>In re Lombardi</u>, 741 F.3d 888, 896 (8th Cir. 2014) (en banc)) (quotation marks omitted).

16

For those reasons, in addition to being untimely, Gissendaner's complaint fails to state a plausible claim for relief.  The district court did not err in dismissing it.

## C.

Like her motion in the district court, Gissendaner's motion in this Court asserts that, even if she has not met the Baze standard, she nevertheless is entitled to a stay of execution because of the Supreme Court's decision to grant certiorari in Glossip, 2015 WL 302647.  She argues that we should stay her execution because the grant of certiorari indicates that the Court is prepared to modify the Baze standard, and that modification will affect her prospects for challenging Georgia's lethal-injection protocol.

We rejected a nearly identical argument in Schwab v. Secretary, Department of Corrections, 507 F.3d 1297 (11th Cir. 2007).  There, the district court had granted the condemned prisoner's motion for a stay of execution based on the Supreme Court's grant of certiorari in Baze.  Id. at 1298.  We vacated the stay "because grants of certiorari do not themselves change the law, [and] they must not be used by courts of this circuit as a basis for granting a stay of execution that would otherwise be denied."  Id.  Our decision in Schwab is the latest in a long line of cases refusing to assign precedential significance to grants of certiorari.  See, e.g., Rutherford v. McDonough, 466 F.3d 970, 977 (11th Cir. 2006) ("[A] grant of

17

certiorari does not change the law."); Ritter v. Thigpen, 828 F.2d 662, 665–66 (11th Cir. 1987) ("A grant of certiorari does not constitute new law."); Thomas v. Wainwright, 788 F.2d 684, 689 (11th Cir. 1986) ("The grant of the writ of certiorari . . . is no authority to the contrary; any implications to be drawn therefrom may be discerned by application to the Supreme Court.").  Until the Supreme Court issues a decision that actually changes the law, we are duty-bound to apply this Court's precedent and to use it and any existing decisions of the Supreme Court to measure the likelihood of a plaintiff's success on the merits. And as we have already explained, this Court's precedent forecloses her claims. See supra Section II.B.

In addition, our determination that Gissendaner's complaint is untimely, see supra Section II.A, means that a decision by the Supreme Court in Glossip is not likely to affect her chance of success on the merits.  A time-barred complaint cannot justify a stay of execution, regardless of whether its claims have merit.  See Henyard, 543 F.3d at 647; cf. Smith v. Johnson, 440 F.3d 262, 263–64 (5th Cir. 2006) (explaining that a pending Supreme Court decision was irrelevant to the prisoner's cause of action given that "he is not entitled to the relief he seeks due to his dilatory filing"); Neville v. Johnson, 440 F.3d 221, 223 (5th Cir. 2006) (applying the same principle).

18

Because Gissendaner has not established a substantial likelihood of success on the merits, she is not entitled to a stay of execution.  See Chavez, 742 F.3d at 1273.

## III.    CONCLUSION

The district court's order denying Gissendaner's motion for a preliminary injunction and dismissing her complaint is **AFFIRMED**.  Gissendaner's motion for a stay of execution is **DENIED**.